## No. 13,263.

### STATE OF LOUISIANA vs. JAMES ROBINSON.

### SYLLABUS.

|  |  |
|---|---|
| 52 | 541 |
| 107 | 801 |
| 52 | 541 |
| 117 | 1089 |
| 117 | 1092 |
| 117 | 1094 |
| 52 | 541 |
| e119 | 142 |

1. When a person is shot, and at once exclaims "Jim Robinson, you shot me to death," and, without delay, runs a distance of little more than half a block, yelling "Jim Robinson shot me," and is there met by another person, who, at the sound of the shooting, had walked rapidly from a point, say a

block distant, in the direction of the shooting, so that the wounded man and the other met within thirty seconds after the shooting, and the wounded man, having fallen, said "I am shot to death," and being asked who shot him, replied "Jim Robinson shot me,' the statements thus made are part of the *res gestae,* and, as such, admissible in evidence on the trial of the person charged with the shooting.

2. Where the accused, being on the stand, as a witness in his own behalf, is asked, on cross-examination, "Were you convicted for hanging on this murder, once, and the question is objected to, and the objection is sustained, and the jury is charged to disregard extraneous evidence, and confine themselves to the impartial consideration of the evidence adduced on the trial; and it appears that the fact of the former trial and conviction, referred to in the question, had come to the knowledge of the jury by means of evidence provoked by cross-examination of State witnesses, and by the jury's being placed in possession of the indictment, with indorsements showing said former trial, conviction, and sentence, the verdict and judgment appealed from will not be disturbed on the ground of injury resulting from the question thus ruled out.

3. Where the accused, charged with murder, has voluntarily placed himself on the stand as a witness in his own behalf, and is asked the question, on cross-examination: "You went up for cutting a man?" the overruling of the objection that the record is the best evidence is not reversible error.

4. It is not reversible error to permit the accused, charged with murder, who is on the stand as a witness in his own behalf, to be asked concerning a conversation, between himself and the man who had been shot by him, in which the accused made statements, concerning the shooting, at varience with those made by him, under oath, before the jury.

5. The interruption, by a brother of the deceased, of the testimony being given by the accused, by an exclamation denying a fact stated by the witness, does not justify the reversal of the verdict and judgment, where it appears that the disturber was called to the bar, rebuked and sentenced to imprisonment, and the jury warned to disregard his ebulition, and the judge *a quo* certifies that, in his opinion, the exclamation produced no effect.

A PPEAL from the Criminal District Court, Parish of Orleans— *Moise, J.*

*Milton J. Cunningham,* Attorney General, *Robert H. Marr,* District Attorney, and *Joseph E. Generelly,* Assistant District Attorney, for Plaintiff, Appellee.

*Paul E. Lassalle* for Defendant, Appellant.

The opinion of the court was delivered by

MONROE, J. Defendant was indicted for murder, tried, convicted and sentenced to death, but, upon appeal to this court, a new trial was granted him. (State vs. Robinson, 51st Ann., 694.) He

has been tried again, convicted of manslaughter, sentenced to imprisonment at hard labor for twenty years, and has again appealed. He now presents his case to this court in five bills of exception, and a motion for new trial.

Bill No. 1. It appears from the recitals of this bill, including the testimony incorporated in it, that, when Paul Valentine, the deceased, was shot, one John Williams, was one block away, that he started "right away" and "walked fast", in the direction of the shooting, that Valentine had, in the meanwhile, been running in Williams' direction, so that Williams testifies: "He met me more than half way". Being asked: "How far was he (Valentine) from the place where he was shot?" the witness replied: "I could not tell you that." Q.—"Was it half a square?" A.—"Near about; a little over". The court thereupon overruled the objection to the question, asked by the Assistant District Attorney: "What did Valentine tell you, when you got to him?", and the witness answered: "He said that he was shot to death. I asked him who shot him. He said Jim Robinson." And counsel for the defendant, thereupon, objected and excepted to the ruling of the court, upon the ground that the deceased had run one square after being shot, and that the deceased (witness?) was near the corner of Hancock and Dauphine, which was fully a square away from where the shooting occurred, and in company with another man, named "Butler, and that the prisoner was not there, and that therefore any statement then made by the deceased, to this witness in regard to the shooting was irrelevant, inadmissible, and no part of the *res gestae*".

The judge *a quo* gives the following as his reasons for his ruling; to-wit:

"The testimony objected to in John Williams' evidence was clearly a part of the *res gestae*. The averment in the bill that the witness was a block from the scene of the shooting when Valentine made his statement is erroneous, as will be seen by Williams' entire testimony, which is made part of these written reasons. The facts are: Lepage, an eye witness to the shooting, heard Valentine exclaim, when shot, 'Jim Robinson, you shot me to death!' Valentine then sped rapidly down Dauphine street, yelling 'Jim Robinson shot me', to use the language of the witness Descossa, whom he passed. Before completing the square, he fell. Williams immediately approached, and Valentine said: 'I am shot to death'. Asked who shot him, he replied: 'Jim

State vs. Robinson.

Robinson shot me'. Thirty seconds could not have elapsed, since the shooting."

＊　　　　＊　　　　＊　　　　＊　　　　＊　　　　＊

"From the time he was shot until Williams reached him, it was the same outpouring of a distracted mind, without the addition of any new matter. Its sameness negatived any idea of premeditation or fabrication, or of its being a narrative, retrospective in character. Continued utterances of the same idea, uninterruptedly made, in the same language, indicate the absence of any suggestiveness. Each outburst is a link in the same chain of thought, and proceeds as much from the same original cause as the wave circles of a pond that dilate, from a point where a pebble is thrown upon its surface."

Counsel for the defendant, in his brief, concedes the correctness of the judge's statement as to the distance between the place of the shooting and that of the declaration of the deceased to the witness, Williams. He says: "The declaration was not made at the place of the event, but a little over half a square away". He argues, however, that the declaration occurred after "the trouble was all over, and after the parties had separated", and that it contained "nothing but the words of one of the participants, when narrating what had become a past event."

We agree with the judge *a quo* that, upon the facts as presented, the declaration objected to was part of the *res gestae*. That it was made at a distance of half a square from the scene of the shooting, does not, under the circumstances disclosed, affect the question; since it was made within thirty seconds after the shooting, and as a direct, immediate, spontaneous, and continuous result of the impression, made by the shooting upon the man who was shot.

In State vs. Estoup, 39 Ann., 219, it appeared that, about ten minutes after the deceased had been shot, his brother was called out of the house, where he was, by some one, who said to him that his brother was shot, that when he went out, he found the man who had been shot, sitting on the steps of a house, about sixty or seventy yards from where the shooting was said to have taken place, in company with a brother-in-law, and it was then, and under those circumstances that the declaration was made to him, which was admitted as part of the *res gestae*. It was held by this court that such admission was erroneous.

In State vs. Melton, 37th Ann., 77, it was sought by the defendants, to prove, as part of the *res gestae,* a certain declaration, made by them six or eight minutes after the killing, after they had gone sixty or eighty yards, and then returned on their way home "or wherever they went", which declaration the judge *a quo* held, was evidently "not spontaneous", as the defendants had met the same witness a few minutes before, twenty-five or thirty yards from the gate, as they were leaving, and "they made no such statement." The testimony was excluded by the trial judge, and this court said: "We cannot say the ruling, under these circumstances was erroneous, but, in any event, the matter is too unimportant to justify a reversal on that ground."

Upon the other hand, in State vs. Eusebe, 42nd Ann., 727, the *syllabus* reads:

"Declarations made by the party shot, immediately after the shooting, are a part of the facts of the case, and of the events inseparable from the crime, and are admissible in evidence as part of the *res gestae.*"

In Traveler's Insurance Co. vs. Mosely, 8th Wallace, 397, it was held that:

"Declarations of a party as to the cause of his injury, as that he had fallen down stairs, made immediately after the occurrence, are admissible as part of the *res gestae,* to show such cause."

In the case thus referred to, the Supreme Court of the United States cites Rex vs. Foster, 6th Carr & P., 325, in which there was an indictment for manslaughter, for killing the deceased by driving a cab over him. A wagoner, who was near by, but did not see the accident, was allowed to testify that, immediately after it happened, on hearing the deceased groan, he went to him, and asked him what was the matter. "Gurney, Baron, said, that what the deceased said at the instant, as to the cause of the accident, was clearly admissible. Park, Baron, said that it was the best possible testimony that, under the circumstances, could be adduced to show what knocked the deceased down. Mr. Justice Patterson concurred. The prisoner was convicted." The court also cited Commonwealth vs. McPike, 3 Cush., (Mass.) 181, where the defendant was charged with killing his wife, and proof was admitted to the effect that the deceased came down stairs from her own room, crying murder, and bleeding, that another woman, into whose room she was admitted, went at her request, for a

physician; that a third person, who had been attracted by her cries, went for a watchman, and, on his return, found the deceased on the floor, bleeding profusely, and that she then told him that her husband had stabbed her.    It was held by the Supreme Court of Massachusetts that her declaration was "of the nature of *res gestae* and that the time when it was made was so recent after the injury was inflicted as to justify receiving it on that ground."    The court cited other cases of a similar character, and then, referring to the case before it, said: "Here, the principal fact is the bodily injury.    The *res gestae* are the statements of the cause made by the assured almost contemporaneously with the occurrence, and those relating to the consequences made while the latter subsisted, and were in progress.    *    *    *   The tendency of recent adjudications is to extend, rather than to narrow, the scope of the doctrine.    Rightly guarded in its practical application, there is no principle in the law of evidence, more safe in its results.    There is none which rests upon a more solid basis of reason and authority."

In People vs. Callaghan, 6 Pac. Rep., 54, it appeared that five or six minutes after the shooting, the deceased said: "Patsy Callaghan shot me", and the court said: "The period of time at which it was made was so recent after the shooting as to justify its admission as part of the *res gestae*.    No time had elapsed for the fabrication of a story."

In Territory vs. Davis, 10 Pac. Rep., 359, it appeared that two or three minutes after he was shot, and after he had been carried to a drug store, a few feet away, the deceased stated that the defendant called to him to get down on his knees, and on his refusal to do so, shot him.    This declaration was permitted to be proved as part of the *res gestae*.

The more generally accepted rule, upon this subject, we think, is fairly stated as follows, to-wit:

That, only, is *res gestae*, which is part of the actual transaction, or which is said or done in so short a time "after the transaction that there could be no time for thought, and for saying the particular thing, or doing the particular act with reference to the probable effect upon future litigation.    The real, or apparent conflict in the adjudications upon the subject, is the result, not of any ambiguity in the rule itself, but of the difference in opinion between courts, as to the length of time that may be permitted to intervene between the act

complained of, and the words or acts that may be permitted to qualify
or explain the original transaction."

26th Central Law Journal, 207.

Bill No. 2.   It appears from this bill, that, during the cross examin-
ation of the defendant, who had placed himself on the stand as a wit-
ness in his own behalf, the Assistant District Attorney asked him:
"Were you convicted for hanging on this same murder once?"    De-
fendant's counsel thereupon objected, "to said question put to the ac-
cused", and his objection was sustained by the court.   He neverthe-
less reserved a bill of exceptions to the questions asked the accused,
notwithstanding the judge's ruling thereon.   "Because said question
was intended and calculated to impress the jury with the fact that the
accused had already been convicted of the same crime, for which he
was then being tried, and that, therefore, they, the jury, ought to do
likewise, because, if he was not guilty, the former jury would not have
found him guilty.   2nd. Because it was in violation of defendant's
legal right, the presumption of innocence, until proven guilty beyond
all reasonable doubt.   It therefore had a tendency to bias the jury."

The judge's statement, made part of the bill, is that the objection
to the question was sustained, and the question remained unanswered,
that the jury was charged not to consider any extraneous evidence,
but to confine themselves, strictly, to an impartial consideration of
the evidence adduced on the trial; but, that there had been a former
trial, conviction, and sentence, was known to the jury, by reason of the
fact that witnesses for the State, being cross-examined on the second
trial, were interrogated with regard to their testimony on said former
trial, and also because the indictment with the indorsements thereon,
showing the prisoner's conviction and sentence, was placed in the
hands of the jury for the purposes of the second trial, without objec-
tion, although they were notified to disregard such indorsements.
Under these circumstances, we are of opinion that no injury to the
defendant, and no reversible error is disclosed in this bill.

Bill No. 3.   During the cross-examination of the defendant, as to
the length of time that he had been out of the penitentiary, and how
long he had been there, he was asked by the Assistant District Attor-
ney: "You went up for cutting a man?", which question was objected
to, on the ground that it "was not a fair one, that the record was the
best proof".   The court overruled the objection, for reasons which are
given at length and which may be summarized as follows: That the

question objected to was intended to show the unlawful and malicious commission of an act of personal violence; an offence similar to the one charged, and for the purpose of impeaching the credibility of the witness, in regard to his statements relating to the crime for which he was being tried. That it was not objected that evidence was not admissible to show that the witness had served in the penitentiary for cutting a man, but that it could not be shown by the witness, the record being the best evidence. That the record, however, was not the best evidence, since it would be necessary to identify the witness with the record. And, if it would be competent, after the production of the record, to ask the witness whether he was the person convicted of such a crime, on such a date, it was equally competent to ask him the question as propounded in the absence of the record, inasmuch as, whether he was the individual who did the cutting, and was tried, convicted, sentenced and imprisoned, were facts within his knowledge, which the record, if produced, would fail to disclose, and which would, therefore, have to be established by evidence *dehors* the record.

We find no reversible error in this ruling. Mr. Wharton in his work on criminal evidence, to which we have been referred by the counsel for the defendant, says:

"In a leading case, Lord Ellenborough, C. J., compelled a witness to answer whether he had not been confined, for theft, in jail, and on the witness appealing to the court, said: 'If you do not answer, I will send you there'. In this country, there has been some hesitation in permitting a question, the answer to which not merely imputes disgrace, but touches on a matter of record; but the tendency now, is, if the question be given for the purpose of honestly discrediting a witness, to require an answer."

Whar. Cr. Ev., Sec. 474.

In Clemens vs. Conrad, 19 Mich., 170, the Supreme Court of Michigan, speaking through Chief Justice Cooley, said:

"The right to inquire of a witness, on cross-examination, whether he has not been indicted and convicted of a criminal offense, we regard as settled in this State by the case of Wilbur vs. Flood, 16th Mich., 40. It is true that, in that case, the question was, whether the witness had been confined in the State prison, not whether he had been convicted; but confinement in a State prison presupposes a conviction by law, and to justify the one inquiry and not the other, would be to uphold a technical rule, and at the same time, point out an easy mode of evading it, without in the least obviating the reasons on

which it rests. We think the reasons for requiring record evidence of conviction have very little application to a case where a party convicted is himself upon the stand, and is questioned concerning it, with a view to sifting his character upon cross-examination. The danger that he will falsely testify to a conviction which never took place, or that he may be mistaken about it, is so slight that it may almost be looked upon as purely imaginary; while the danger that worthless characters will unexpectedly be placed upon the stand with no opportunity for the opposite party to produce the record evidence of their infamy, is always palpable and iminent. We prefer the early English rule on this subject. Priddle's Case, Leach C. L. 382. King vs. Edwards, 4 T. R. 440, and for the reasons which were stated in Wilbur vs. Flood."

In State vs. Murphy, 45th Ann., 958, the question was asked a defendant in a criminal prosecution, who had voluntarily taken the stand, under Act 29 of 1886, as a witness in his own behalf: "Have you ever been arrested for stealing?", and the objection was made, among others: "That the records, if any, were primary evidence of the facts sought to be proven". It was held that: "Where, upon the trial the defendant offers himself as a witness, and testifies in his own behalf, under the statute of 1886, he thereby becomes subject to the same rules and is called upon to submit to the same tests which are legally applied to other witnesses," and the ruling of the lower court, overruling the objection, was sustained.

This ruling has been affirmed in the State vs. Alexis, 45th Ann., 973, and in the State vs. Southern *et als.*, 48th Ann., 628.

Bill No. 4, was reserved to the action of the trial judge, in overruling the objections to the following questions propounded by the Assistant District Attorney to the accused, whilst the latter was on the stand as a witness, on cross-examination, to-wit:

"Q.—You were brought to Valentine's bed-side?

"A.—Yes, sir.

"Q.—When you were brought there, did not Valentine say: 'Jim, you shot me?'

"A.—Yes, sir.

"Q.—And did not you say 'No, Paul, I did not do it'?

"A.—Yes, sir; I had a reason, because I seen his brother with a double-barrel shot gun in the yard."

The ground of objection was "that anything said to the accused

after the shooting by Paul Valentine, unless it was a dying declaration, was not evidence and not part of this case." The reasons of the judge for overruling the objection are thus stated: "In his direct examination, the witness testified he did the killing. At the bedside of the accused (deceased?) he denied it. It was competent to show that out of court he made statements inconsistent with those he made in court, under oath. It was also competent to question the witness in relation to his prior statements, to lay the foundation for contradicting him, if they did not agree with those given in court. The repetition of the language of the deceased, in the question: 'Didn't Valentine say Jim you shot me?', could not possibly injure the accused, as he admitted the killing; and, as a part of the *res gestae,* many other witnesses swore that Valentine had used the identical language, while eye witnesses swore to the fact that Robinson did the killing, which was uncontradicted, and admitted, the defence being self-defence."

It will be observed that the question of the admissibility of evidence as to this conversation between the accused and the wounded man now presents itself under very different circumstances from those by which it was surrounded, when this case was before us on a previous occasion. The question then was, whether the State could prove the conversation by Officer Felix Vauquelin, and two or three other persons. It was held that the evidence was not admissible, because the statement made by the deceased to the accused was not a dying declaration, and was not part of the *res gestae,* and hence, that the testimony of the "officer" and the "others", was merely a repetition, by those witnesses, of an accusation made against the accused, by another person, and denied by the accused. The court said: "This testimony must be regarded as that of Paul Valentine; and, if he were living and had been put on the stand, as a witness for the State, he certainly could not have been permitted to relate *what accusations he made against the accused, as proof of his identity."*

That Robinson had gone upon the stand as a witness, did not appear upon the former appeal. It was, therefore, said, in the course of the opinion: "It was certainly not the purpose of the State, in introducing these witnesses, to prove the defendant's denial of Valentine's accusation."

As the case is now presented, however, it appears that the accused voluntarily placed himself on the stand, as a witness in his own behalf, that he admitted the killing, and set up a plea of self-defence,

and the State had, therefore, the right to impeach his credibility, and to lay the foundation for such impeachment, by cross-examining him as to a conversation which he had had upon the subject of the killing, in which it was believed he had made a statement at variance with that made by him under oath, before the jury. The questions asked, were, we think, a competent exercise of that right.

State vs. Murphy, 45th Ann., 958; State vs. Alexis, 45th Ann., 973; State vs. Southern et als., 48th Ann., 628.

The motion for new trial is based upon the grounds set up in the bills of exception which have been thus considered, and upon the further ground, that, during the trial, when the accused testified that his reason for denying the shooting, in his conversation with Valentine, was, that Valentine's brother was in the yard with a double-barrelled shot gun, the said brother, Procese Valentine, in open court, and in the presence of the jury, jumped up and exclaimed, in a very excited manner that "he didn't have no gun", and that said action operated grave injury and prejudice to the accused.

Bill No. 5 having been taken to the refusal to grant a new trial, includes this ground of complaint. The judge a quo says: "Procese Valentine's sudden exclamation was immediately noticed by the court. He was promptly brought to the bar, in the presence of the jury, rebuked, sentenced to imprisonment for twenty-four hours for contempt, and the jury instructed to disregard the negro's ebullition. In my opinion, it did not affect the case."

We have no reason for differing with the learned judge and do not feel authorized to reverse his findings upon a matter with respect to which he was so peculiarly competent to determine.

Judgment affirmed.