MARY ROSS, as Surviving Wife of J. F. Ross, Deceased, v. HARRY J. COOPER.

(164 N. W. 679.)

Action to recover damages for the killing by McLain Cooper, son and employee of defendant, of one James F. Ross, foreman of defendant's farm. McLain Cooper shot three times at Ross without injuring him; then discharged Ross from defendant's employment ordering him to "leave the place." Subsequently, while Ross was over 50 yards distant from where the first shots had been fired and en route to the dwelling house, McLain Cooper overtook him and immediately and without warning shot Ross through the back, mortally wounding him, exclaiming, "I have got plenty more," meaning bullets. McLain Cooper and Ross had quarreled the night before, ending in an altercation in which Ross had thrown Cooper and had choked him. When Ross saw him at 7 o'clock next morning, McLain Cooper met him with a drawn revolver and stated that he "was going to shoot" Ross and immediately fired three shots at him. An appreciable interval then elapsed during which Ross was discharged by young Cooper. A short time later Ross was shot. It is admitted that McLain Cooper had authority as an employee of defendant to discharge Ross, and that he did so. The defendant during this time was away, without the state, and knew nothing of these events. *Held:*

**Findings of jury — no evidence to sustain — liability of one — for acts of another.**

1. There is no proof to sustain the finding of the jury that, in shooting Ross, McLain Cooper was acting in furtherance of or to facilitate the discharge of, or the ejectment of, Ross from the defendant's farm following such discharge, or in any way acting for the defendant; and hence there is no liability of defendant to plaintiff for the malicious killing of Ross by the son.

**Evidence — without substantial conflict — reasonable presumption — inference — or construction — killing of party — circumstances amounting to murder — party acted independently — master and servant — no such relation existed.**

2. The evidence, without substantial conflict, under every reasonable presumption, inference from, or construction of it, affirmatively establishes that,

in killing Ross under circumstances amounting to murder, McLain Cooper was acting independently and for himself in the execution of his premeditated design to kill Ross, and that he was not in any degree or particular acting for his father, the defendant. In the making of this murderous assault upon Ross, no relation of master and servant as to it existed between the father and son.

Opinion filed December 19, 1916. Rehearing denied October 5, 1917.

Appeal from a judgment of the District Court of Traill County, *Pollock,* J.

Reversed and ordered dismissed.

P. G. *Swenson* and *Bangs, Hamilton, & Bangs,* for appellant.

Statements made with a view to the apprehension of the offender do not form part of the *res gestæ.* 34 Cyc. 1645; Westcott v. Waterloo, C. F. & N. R. Co. 173 Iowa, 355, 155 N. W. 255; Puls v. Grand Lodge, A. O. U. W. 13 N. D. 559, 102 N. W. 165.

The *res gestæ* rule, together with examples or illustrations of its application, may be found well stated in the following cases. The rule is that statements made by a party must be contemporaneous with the principal act to which they relate, and there must not be such a lapse of time as to give opportunity to premeditate and to fabricate a story. Puls v. Grand Lodge, A. O. U. W. supra; Louisville, N. A. & C. R. Co. v. Buck, 116 Ind. 566, 2 L.R.A. 520, 9 Am. St. Rep. 883, 19 N. E. 453; Britton v. Washington Water Power Co. 59 Wash. 440, 33 L.R.A.(N.S.) 109, 140 Am. St. Rep. 858, 110 Pac. 20; State v. Deuble, 74 Iowa, 509, 38 N. W. 383; Pittsburgh, C. C. & St. L. R. Co. v. Haislup, 39 Ind. App. 394, 79 N. E. 1035; Waldele v. New York C. & H. R. R. Co. 95 N. Y. 274, 47 Am. Rep. 41; Hill v. Ætna L. Ins. Co. 150 N. C. 1, 63 S. E. 124.

The statements must not be mere recitals of past events, and the court will reject them where there has been such a lapse of time as to afford opportunity to premeditate or to fabricate a story that will tend to uphold the claim. Westcott v. Waterloo, C. F. & N. R. Co. 173 Iowa, 355, 155 N. W. 255.

Dying declarations cannot be used or offered in a civil action. Barfield v. Britt, 47 N. C. (2 Jones, L.) 41, 62 Am. Dec. 190; 1 Phillipps, Ev. Cowen & Hill's notes, 610; 1 Greenl. Ev. § 156, and cases cited; Jackson ex dem. Coe & Kniffen, 2 Johns. 31, 3 Am. Dec. 390; Marshall.

v. Chicago G. E. R. Co. 48 Ill. 475, 95 Am. Dec. 561; Wilson v. Boerem, 15 Johns. 286; Wooten v. Wilkins, 39 Ga. 223, 99 Am. Dec. 456; Daily v. New York & N. H. R. Co. 32 Conn. 356, 87 Am. Dec. 176; Thayer v. Lombard, 165 Mass. 174, 52 Am. St. Rep. 507, 42 N. E. 563; People v. Hodgdon, 55 Cal. 76, 36 Am. Rep. 30; People v. Stison, 140 Mich. 216, 112 Am. St. Rep. 397, 103 N. W. 542, 6 Ann. Cas. 69; State v. Meyer, 64 N. J. L. 382, 45 Atl. 779; Thurston v. Fritz, 91 Kan. 468, 50 L.R.A.(N.S.) 1167, 138 Pac. 625; Worthington v. State, 92 Md. 222, 56 L.R.A. 360, 84 Am. St. Rep. 506, 48 Atl. 355.

The defendant in this case was in no manner responsible for or connected with the act of the killing of plaintiff's husband. There was no relation of master and servant existing between the person who did the act and this defendant, and the court seriously erred in admitting evidence on such feature of the case. Stephenson v. Southern P. Co. 93 Cal. 558, 15 L.R.A. 475, 27 Am. St. Rep. 223, 29 Pac. 234; Everingham v. Chicago, B. & Q. R. Co. 148 Iowa, 662, 127 N. W. 1009, Ann. Cas. 1912C, 848; Haehl v. Wabash R. Co. 119 Mo. 325, 24 S. W. 737; Firemen's Fund Ins. Co. v. Schreiber, 150 Wis. 42, 45 L.R.A.(N.S.) 314, 135 N. W. 507, Ann. Cas. 1913E, 823; Kincade v. Chicago, M. & St. P. R. Co. 107 Iowa, 682, 78 N. W. 698, 6 Am. Neg. Rep. 64; Galehouse v. Minneapolis, St. P. & S. Ste. M. R. Co. 22 N. D. 624, 47 L.R.A.(N.S.) 965, 135 N. W. 189.

Where a master is sought to be held liable in damages for the wrongful act of his servant, this relationship must first be clearly established, and then it must also clearly appear that the servant was acting within the scope of his employment, and not acting for himself individually, and outside and independent of his employment. Dolan v. Hubinger, 109 Iowa, 408, 80 N. W. 514, 6 Am. Neg. Rep. 506; Kincade v. Chicago, M. & St. P. R. Co. 107 Iowa, 682, 78 N. W. 698, 6 Am. Neg. Rep. 64; Golden v. Newbrand, 52 Iowa, 59, 35 Am. Rep. 257, 2 N. W. 537; Porter v. Chicago, R. I. & P. R. Co. 41 Iowa, 358; Everingham v. Chicago, B. & Q. R. Co. 148 Iowa, 662, 127 N. W. 1009, Ann. Cas. 1912C, 848; Holler v. Ross, 68 N. J. L. 324, 59 L.R.A. 943, 96 Am. St. Rep. 546, 53 Atl. 472.

The act of Cooper (McLain) was clearly wilful; it was as wrongful as it was wilful; it could not be characterized as less than mali-

cious, and it was inspired by a feeling of personal resentment to punish Ross, and these facts and conditions completely take his act out of the category of acts which would impose a liability upon the defendant. Ducre v. Sparrow-Kroll Lumber Co. 168 Mich. 49, 47 L.R.A.(N.S.) 959, 133 N. W. 938, 2 N. C. C. A. 596.

"A master is responsible for the negligent and wilful tort of his servant only when committed in the sphere of the servant's duty, and while acting in the master's behalf." Firemen's Fund Ins. Co. v. Schreiber, 150 Wis. 42, 45 L.R.A.(N.S.) 314, 135 N. W. 507, Ann. Cas. 1913E, 823; Smith v. Louisville & N. R. Co. 95 Ky. 1, 22 L.R.A. 72, 23 S. W. 652; Curtis v. Dinneen, 4 Dak. 245, 30 N. W. 148; Waller v. Great Northern R. Co. 22 S. D. 256, 18 L.R.A. (N.S.) 297, 117 N. W. 140; Morier v. St. Paul, M. & M. R. Co. 31 Minn. 351, 47 Am. Rep. 793, 17 N. W. 952; Lovejoy v. Campbell, 16 S. D. 231, 92 N. W. 24.

"Where the deviation from duty is very marked and unusual, the court may determine that the servant was not on the master's business at all, but on his own." Rounds v. Delaware, L. & W. R. Co. 64 N. Y. 129, 21 Am. Rep. 597, 8 Am. Neg. Cas. 536; Little Miami R. Co. v. Wetmore, 19 Ohio St. 110, 2 Am. Rep. 373; Howe v. Newmarch, 12 Allen, 49; Brennan v. Merchant & Co. 205 Pa. 258, 54 Atl. 891, 15 Am. Neg. Rep. 672; Kincade v. Chicago, M. & St. P. R. Co. 107 Iowa, 682, 78 N. W. 698, 6 Am. Neg. Rep. 64; Farber v. Missouri P. R. Co. 116 Mo. 81, 20 L.R.A. 350, 22 S. W. 631, 8 Am. Neg. Cas. 475; Roberts v. Southern R. Co. 143 N. C. 176, 8 L.R.A.(N.S.) 798, 55 S. E. 509, 10 Ann. Cas. 375.

*Chas. A. Lyche,* for respondent.

"When a person receives a sudden injury, it is natural for him, if in the possession of his faculties, to state at once how it happened. Metaphorically, it may be said the act speaks through him and discloses its character." Murray v. Boston & M. R. Co. 72 N. H. 37, 61 L.R.A. 495, 101 Am. St. Rep. 660, 54 Atl. 289.

"If it is so connected with the transaction as a whole that the utterance, in the opinion of the court, may be regarded as an expression of feeling forced instinctively from the declarant by pressure of the circumstances under which it is made, rather than be deemed the narrative result of thought, it is evidence of what it asserts even

though it constitutes part of no particular fact in the *res gestæ."*
16 Cyc. 1248; Herren v. People, 28 Colo. 23, 62 Pac. 833; T. & H.
Pueblo Bldg. ·Co. v. Klein, 5 Colo. App. 348, 38 Pac. 608; State
v. Hunter, 131 Minn. 252, L.R.A.1916C, 566, 154 N. W. 1083;
16 Cyc. 1249, and cases cited.

"No precise rule can be formulated, and each ·case stands upon its
own footing." The element of time, therefore, has no controlling
·effect. 16 Cyc. 1250–1252, 1254, and cases cited; Puls v. Grand
Lodge, A. O. U. W. 13 N. D. 559, 102 N. W. 165; Bessierre v.
Alabama City, G. & A. R. Co. 179 Ala. 317, 60 So. 82; Andrews v.
United States Casualty Co. 154 Wis. 82, 142 N. W. 487; Louis-
ville & N. R. Co. v. Owens, 164 Ky. 557, 175 S. W. 1039; Grant
v. Kansas City Southern R. Co. 172 Mo. App. 334, 157 S. W. 1016;
Davis v. State, 70 Tex. Crim. Rep. 37, 155 S. W. 546.

A declaration by a person made more than two minutes after
the shooting and while he was excited and seeking to get away, to
the effect that he had been robbed and shot, was held admissible as a
part of the *res gestæ.* Wilson v. State, 70 Tex. Crim. Rep. 627, 158
S. W. 512; Hedlund v. Minneapolis Street R. Co. 120 Minn. 319,
139 N. W. 603; 16 Cyc. 1255; International & G. N. R. Co. v.
Smith, — Tex. —, 14 S. W. 642, 6 Am. Neg. Cas. 585; McCam-
bridge v. Chicago, 178 Ill. App. 513; Middleton v. Cedar Falls, 173
Iowa, 619, 153 N. W. 1040; Smith v. Stoner, 243 Pa. 57, 89 Atl. 795;
Murray v. Boston & M. R. Co. 72 N. H. 32, 61 L.R.A. 495, 101
Am. St. Rep. 660, 54 Atl. 289; Fulcher v. State, 28 Tex. App. 465,
13 S. W. 750.

"A condition of severe bodily injury, unmitigated by medical or
other attendance, makes it provable that a statement made while
this condition continues is spontaneous, even if made during the
·effort to secure such help." 16 Cyc. 1255, and cases cited; Ohio & M.
R. Co. v. Stein, 19 L.R.A. 733, and note, 133 Ind. 243, 31 N. E.
180, 32 N. E. 831; Puls v. Grand Lodge, A. O. U. W. 13 N. D. 559,
102 N. W. 165; 3 Wigmore, Ev. ¶ 1747, pp. 2250, 2252, and cases
·cited; Alsever v. Minneapolis & St. L. R. Co. 115 Iowa, 338, 56
L.R.A. 748, 88 N. W. 841; Gant v. State, 73 Tex. Crim. Rep. 279, 165
S. W. 142; Travellers' Ins. Co. v. Mosley, 8 Wall. 397, 19 L. ed. 437.

The tendency of recent adjudications is to extend, rather than to

narrow, the scope of the doctrine. When sickness is the subject of inquiry, the sickness is the principal fact. The *res gestæ* are the declarations tending to show the reality of its existence and its extent and character. Rightly guarded in its practical application, there is no principle in the law of evidence more safe in its results. 11 Enc. Ev. 330; Little Rock, M. R. & T. R. Co. v. Leverett, 48 Ark. 333, 3 Am. St. Rep. 230, 3 S. W. 50; Washington & G. R. Co. v. McLane, 11 App. D. C. 220; Southern R. Co. v. Brown, 126 Ga. 1, 54 S. E. 911; Fish v. Illinois C. R. Co. 96 Iowa, 702, 65 N. W. 995; Alsever v. Minneapolis & St. L. R. Co. 115 Iowa, 338, 56 L.R.A. 748, 88 N. W. 841; Keyes v. Cedar Falls, 107 Iowa, 509, 78 N. W. 24; Louisville & N. R. Co. v. Shaw, 21 Ky. L. Rep. 1041, 53 S. W. 1048; State v. Robinson, 52 La. Ann. 541, 27 So. 129, 13 Am. Crim. Rep. 357; People v. Simpson, 48 Mich. 474, 12 N. W. 662; People v. Brown, 53 Mich. 531, 19 N. W. 172; Head v. State, 44 Miss. 731; Elkins v. McKean, 79 Pa. 493; Farris v. State, — Tex. Crim. Rep. —, 56 S. W. 336; Smith v. State, 21 Tex. App. 277, 17 S. W. 471; Gantier v. State, — Tex. Crim. Rep. —, 21 S. W. 255; Craven v. State, 44 Tex. Crim. Rep. 78, 122 Am. St. Rep. 799, 90 S. W. 311; Berry v. State, 44 Tex. Crim. Rep. 395, 72 S. W. 170; Chapman v. State, 43 Tex. Crim. Rep. 328, 96 Am. St. Rep. 894, 65 S. W. 1098; Drake v. State, 29 Tex. App. 265, 15 S. W. 725; Bowles v. Com. 103 Va. 816, 48 S. E. 527; Dixon v. Northern P. R. Co. 37 Wash. 310, 68 L.R.A. 895, 107 Am. St. Rep. 810, 79 Pac. 943, 2 Ann. Cas. 620; Hooker v. Chicago, M. & St. P. R. Co. 76 Wis. 542, 44 N. W. 1085; Lexington v. Fleharty, 74 Neb. 626, 104 N. W. 1056; De Walt v. Houston, E. & W. T. R. Co. 22 Tex. Civ. App. 403, 55 S. W. 534.

The mere fact that the statement was made in response to a question does not deprive it of its character as *res gestæ,* if otherwise competent. Murray v. Boston & M. R. Co. 72 N. H. 32, 61 L.R.A. 495, 101 Am. St. Rep. 660, 54 Atl. 289; Fish v. Illinois C. R. Co. 96 Iowa, 702, 65 N. W. 995; Crookham v. State, 5 W. Va. 510; State v. Martin, 124 Mo. 514, 28 S. W. 12; Rex v. Foster, 6 Car. & P. 325; Sutcliffe v. Iowa State Traveling Men's Asso. 119 Iowa, 220, 97 Am. St. Rep. 298, 93 N. W. 90; Springfield Consol. R. Co. v. Hoeffner, 175 Ill. 634, 51 N. E. 884; Thomas v. State, 47 Tex. Crim. Rep. 534, 122 Am. St. Rep. 712, 84 S. W. 823; State v. Maxey,

107 La. 799, 32 So. 206; Sullivan v. Henry Guth & Co. 148 Ill. App. 538.

The fact that the dying statement was made under a sense of impending death may always be proved by the express words of the deceased if made a part of his declaration. 21 Cyc. 982 (9), and cases cited.

It is the impression of immediate dissolution, and not the rapid succession of death in point of fact, that renders the testimony admissible. 1 Greenl. Ev. § 158; State v. Reed, 53 Kan. 767, 42 Am. St. Rep. 322, 37 Pac. 174; People v. Weaver, 108 Mich. 649, 66 N. W. 567; Rakes v. People, 2 Neb. 157; People v. Simpson, 48 Mich. 474, 12 N. W. 662; Fitzgerald v. State, 11 Neb. 577, 10 N. W. 495; State v. Sadler, 51 La. Ann. 1397, 26 So. 390; Reynolds v. State, 68 Ala. 502, 4 Am. Crim. Rep. 153; State v. Nash, 7 Iowa, 347; Com. v. Birriolo, 197 Pa. 371, 47 Atl. 355; State v. Nocton, 121 Mo. 537, 26 S. W. 551; People v. Chase, 79 Hun, 296, 29 N. Y. Supp. 376; Jones v. State, 71 Ind. 66; State v. Banister, 35 S. C. 290, 14 S. E. 678; Com. v. Haney, 127 Mass. 455; Rex v. Mosley, 1 Moody, C. C. 97, 1 Lewin, C. C. 189; Baxter v. State, 15 Lea, 657.

These declarations are admissible in civil actions. "The general principle on which this species of evidence is admitted is that they are declarations made in extremity, when the party is at the point of death, and when every hope of this world is gone; when every motive of falsehood is silenced and the mind is induced, by the most powerful considerations, to speak the truth, a situation so solemn being considered by the law as creating an obligation equal to that which is imposed by a positive oath administered in a court of justice." 21 Cyc. 975, 976, and cases cited; Thurston v. Fritz, 91 Kan. 468, 50 L.R.A.(N.S.) 1167, 138 Pac. 625; State v. Wilson, 24 Kan. 189, 36 Am. Rep. 257; Luker v. Com. 9 Ky. L. Rep. 385, 5 S. W. 354; People v. Beverly, 108 Mich. 509, 66 N. W. 379; Payne v. State, 61 Miss. 161, 4 Am. Crim. Rep. 155; People v. Knickerbocker, 1 Park. Crim. Rep. 302; State v. Saunders, 14 Or. 300, 12 Pac. 441.

"If the sole reason for the admissibility of dying declarations lies in the reliability resting on the solemnizing influence of approaching death, there would seem to be no reason why the declarations, if material, should not be used in civil as well as criminal cases." 1

Elliott, Ev. § 351; Clymer v. Littler, 3 Burr. 1244, 97 Eng. Reprint, 812, 1 W. Bl. 345, 96 Eng. Reprint, 192; Aveson v. Kinnaird, 6 East, 188, 102 Eng. Reprint, 1258, 2 Smith, 286, 8 Revised Rep. 455; Durham v. Beaumont, 1 Campb. 211; Goodwin v. Harrison, 1 Root, 80.

To exclude such declarations in civil actions "appears to be straining" to do justice at the expense of a violation of well-known rules. M'Farland v. Shaw, 4 N. C. (2 Car. Law Repos. 102); Worthington v. State, 92 Md. 222, 56 L.R.A. 353, 84 Am. St. Rep. 506, 48 Atl. 355.

If such declarations would be competent and admissible in a criminal case based upon the same facts, and because of their inherent value under the principles of evidence, the argument would be unanswerable that they should be admitted in a civil action in which the only issue is exactly the same. Cosgrove v. Schafer, 9 Ohio Dec. Reprint, 550; 2 Wigmore, Ev. § 1431.

"Although the rule of *stare decisis* is entitled to great weight, and is adhered to in most courts, yet it is not followed to the exclusion in all cases of a departure therefrom; and it is a doctrine generally recognized that the rule will not be invoked to sustain and perpetuate a principle of law which is established by a series of decisions, clearly erroneous, unless property complications have resulted therefrom, and a reversal would result in greater injury and injustice than would ensue by following the rule." 1 Am. L. J. 366; 11 Cyc. 749 and cases cited; McFarland v. Pico, 8 Cal. 626; Ellison v. Georgia R. & Bkg. Co. 87 Ga. 691, 13 S. E. 809, 14 Am. Neg. Cas. 167; Paul v. Davis, 100 Ind. 422; Jasper County v. Allman, 142 Ind. 573, 39 L.R.A. 58, 42 N. E. 206; State v. Hill, 47 Neb. 456, 66 N. W. 541; Thurston v. Fritz, 91 Kan. 468, 50 L.R.A.(N.S.) 1167, 138 Pac. 625; 1 Greenl. Ev. 15th ed. § 156; 1 Wigmore, Ev. §§ 578, 1436; 11 Cyc. 749; Fish v. Poorman, 85 Kan. 237, 116 Pac. 898.

The common doctrine as to dying declarations has become so embedded in our judicial system that it should be left untouched. Harrington v. Lowe, 73 Kan. 1, 4 L.R.A.(N.S.) 547, 84 Pac. 570.

To the dying declaration here involved there was no objection offered as to its competency. It is in writing and "relates to such facts only as the declarant would have been competent to testify to if sworn as a

witness in the case." Oliver v. State, 17 Ala. 587; Whitley v. State, 38 Ga. 50; Brock v. Com. 92 Ky. 183, 17 S. W. 337; People v. Knapp, 26 Mich. 112; State v. Reed, 137 Mo. 125, 38 S. W. 574; State v. Carrington, 15 Utah, 480, 50 Pac. 526.

They are equally admissible even if they are only in answer to leading questions. 4 Enc. Ev. 983, 984.

It is not necessary that they be reduced to writing. 4 Enc. Ev. 987; Brown v. State, 32 Miss. 443; Reg. v. Steele, 12 Cox, C. C. 168; People v. Gray, 61 Cal. 164, 44 Am. Rep. 549; People v. Hodgdon, 55 Cal. 72, 36 Am. Rep. 30; Mockabee v. Com. 78 Ky. 380; Young v. Com. 6 Bush, 312; State v. McEvoy, 9 S. C. 208; Snell v. State, 29 Tex. App. 236, 25 Am. St. Rep. 723, 15 S. W. 722; Thurston v. Fritz, 91 Kan. 468, 50 L.R.A.(N.S.) 1167, 138 Pac. 625; Ellison v. Georgia R. & Bkg. Co. 87 Ga. 691, 13 S. E. 809, 14 Am. Neg. Cas. 167.

The answer admits that at the time in question, McLain S. Cooper (the man who killed Ross), in the exercise of the power vested in him by this defendant, did "discharge" said Ross from the employment of this defendant, and the jury found that he was engaged in the furtherance of his master's business. Richberger v. American Exp. Co. 73 Miss. 161, 31 L.R.A. 390, 55 Am. St. Rep. 522, 18 So. 922.

From a consideration of the evidence in this case and from a careful study of the authorities, there can be no question but that McLain S. Cooper was acting for the defendant and in the discharge of his employment, when he shot Ross. Ross was still working for defendant in his regular employment, and the same is also true of young Cooper. Anderson v. International Harvester Co. 104 Minn. 49, 16 L.R.A. (N.S.) 440, 116 N. W. 101.

In the case at bar the charge given at the request of the appellant states the proposition much more favorably for the defendant than the law justifies in such cases. Penas v. Chicago, M. & St. P. R. Co. 112 Minn. 203, 30 L.R.A.(N.S.) 627, 140 Am. St. Rep. 470, 127 N. W. 926.

A master owes his servant duties which are nondelegable on proof of the breach of which by another servant the master is liable, irrespective of the motive of the servant. 1 Thomp. Neg. 2d ed. 553, 554; Penas v. Chicago, M. & St. P. R. Co. supra.

Appellant's assignments of error not argued are presumed abandoned. Schmidt v. Beiseker, 19 N. D. 35, 120 N. W. 1096; Pendroy v. Great Northern R. Co. 17 N. D. 433, 117 N. W. 531; Supreme Court Rule No. 34.

Goss, J.   This is an appeal from the final judgment and from an order denying motion for judgment notwithstanding the verdict.   Sufficiency of the evidence to sustain the verdict will be first inquired into.

The action arose out of the killing of James Franklin Ross on March 11, 1911, by McLain S. Cooper, the twenty-one-year-old son of defendant, Harry J. Cooper.   Plaintiff is the widow of deceased.   Ross, with his wife and family, had worked for defendant for more than two years, living on defendant's farm.   The homicide occurred on said farm in Traill county.   Defendant was South for the winter, and at no time in controversy was present at, or had knowledge of, events transpiring and upon which this action is based.   On leaving for the South for the winter defendant had told Ross that "McLain Cooper would be on the farm that winter; that he (defendant) would be too far away to communicate with, and if anything out of the ordinary came up to go to McLain; I wasn't anticipating anything out of the ordinary coming up."

Otherwise Ross was in charge as farm foreman.   McLain Cooper had been on the farm prior to that winter and was there during that winter.   On March 11, 1911, at about 7 o'clock in the morning, McLain Cooper discharged Ross after shooting three times at him.   While Ross was afterward walking to the dwelling house some hundred yards away, McLain Cooper overtook him and, without warning, shot Ross through the back, mortally wounding him.

The complaint predicates liability upon the fact that the son had been left "to manage and control the operation of said farm, with full and complete authority and power to hire, employ, and discharge such servants, agents, and employees as he, McLain Cooper, might deem necessary and convenient; that on March 11, 1911, McLain Cooper in exercise of the power delegated to and vested in him by the defendant, did discharge Ross from the employment of the defendant, and while so exercising such power and authority and while Ross was peaceably preparing to leave, and without giving Ross the slightest chance to leave

said farm and employment peaceably, proceeded to eject him there-
from; and while so engaged, and while acting for defendant therewith
in the scope of his employment, and exercising the powers and authority
so conferred upon him, he, McLain Cooper, in utter disregard of the
safety of said Ross, did, without the slightest cause, excuse, or justi-
fication, with unnecessary violence wilfully, intentionally, maliciously,
and unlawfully assault Ross, and with force and violence shoot and
mortally wound him, of which he died on August 6, 1911."

Damages in the sum of $50,000 is demanded. A verdict for plain-
tiff for $3,500 was returned. The answer admits Ross was the servant
of the defendant, as superintendent of said farm, when killed, "and
that after the 13th day of December, 1910, he so worked and labored
under the charge and authority of said McLain Cooper by virtue of
the employment of said McLain Cooper by his father, and that he so
continued to render service until March 11, 1911." The answer fur-
ther admits "that on March 11, 1911, McLain Cooper, in the exercise of
the power delegated to and invested in him by Harry J. Cooper, did dis-
charge Ross from the employment of said Harry J. Cooper, and admits
that on March 11, 1911, McLain Cooper did shoot and mortally wound
Ross. But defendant denies that said McLain Cooper proceeded to
eject Ross from said farm at the time, and denies that said McLain
Cooper shot or wounded Ross while engaged in ejecting Ross from said
farm, or while acting for Harry J. Cooper or within the scope of his
employment, or while exercising any power or authority conferred upon
him by this defendant or by virtue of his employment or agency."

This presents the issues. In brief, the employment of both Ross and
McLain Cooper as employees of defendant, Harry J. Cooper, is ad-
mitted, as is the fact that the son had due authority to and did in the
exercise thereof discharge Ross from defendant's employment. As de-
fendant by his motion for judgment *non obstanti* has challenged the
sufficiency of the evidence to sustain plaintiff's cause of action on the
merits, and asserts that it affirmatively discloses no cause of action, all
the evidence bearing on the discharge will now be set forth.

Plaintiff's case is made up of the dying declaration of Ross, narrating
his employment and events up to and surrounding the shooting. It
reads:

"The way this trouble started on the 10th of March, 1911, this Jack

Hulet was milking— . . . he was doing the milking, and we had a cow that nobody could milk; I couldn't milk her, and he told McLain that he couldn't. Just before dinner, McLain come to me and asked if I could send that cow down to the Sutton farm. I told him, 'After dinner,' and so he came around after dinner and he says, 'You don't need to take the cow down.' He said, 'The kid would milk her;' the kid is George. . . . And so when they started to milk he couldn't do anything, and he couldn't get no milk from her, and McLain was helping him and they couldn't do anything and they was mad, jumping around there, but didn't say anything, and that is where you might say the row started. So, when I asked him at 7 o'clock if he wasn't going to supper, he said 'he would go when he damn pleased.' My wife was around the house sick, and she didn't feel like keeping meals all night, so he said he would get supper when he damned please, and he started toward the door and I started toward him. He looked pretty mad and we clinched right at the door. We laid down on the ice a little bit, and I told him, 'If you want to get up and be a man and go in and get your supper, I will let you up,' and finally he says, 'all right.' . . . When we had this trouble, John Hulet come along, and he says, 'Let up Frank.' I says, 'I ain't hurting him, any time he wants to get up and behave, I will let him up.' . . . During the trouble with McLain I didn't strike him. I choked him a little, but it never made a mark on him. I didn't have any weapons with me at the time. I didn't make any threats against him at that time, not a thing, and I didn't injure him. I had the prettiest chance in the world if I wanted to, but I didn't want to. I had never made any threats against McLain Cooper during the time that I was there, and I had had no trouble with him up to this time. He had never asked me to leave the farm. I didn't see him again that night after he went to the Sutton farm. All that I did to him was to put him down on the ground and hold him there. He didn't get a scratch. I must have throwed him. We were right at the door and he was making for me and I for him and I catched him. It was all ice and water and it wasn't much of a trick to throw anyone there, it was so slippery there. . . . I didn't throw him over the fence, and didn't injure him a bit; there wasn't a scratch on him; I don't think there was a scratch on me. I next saw McLain Cooper, after this scrap, about 7

or 7:15 the next morning. We had breakfast at 7 o'clock and we went out to the barn. I went back in the barn and got a pail of feed for the pigs, and when I come to the door, the barn door, I met the gun. McLain Cooper, the son of Harry J. Cooper, held that gun. He says, 'I am going to shoot you.' He threw the gun in my face, and he said, 'I am going to shoot you, Frank.' I says, 'Go ahead and shoot'—something like that, and I walked down a little further and I went into the other door and getting down to this door he shot at me twice—that is the sheep-shed door—he shot at me twice; when I got down to the sheep shed, he shot again. When he fired the third shot I was inside. Nobody said anything during the time that he was firing. The first two shots my back was to him and when I got to the shed I wouldn't say. None of these shots hit me. The first two struck the barn, I couldn't swear to that. The only thing—there is witnesses that saw the bullet holes in the building, but I couldn't say for I never got back to the barn. I think when the third shot was fired I was emptying the feed out. Up to this time he never said a word. The only remark I heard was, 'I am going to shoot you'—that was the first thing. Then John Hulet hitched up the team and he was just going around the corner of the barn and I got back there and I says, 'Put your team in the barn, Jack. It is getting too hot here for me.' 'Well,' Jack says, 'throw up your hands—why don't you throw up your hands and find out what he wants.' So I did; I throwed up my hands and I says, 'What do you want?' He says 'I want you to leave the place.' That is, McLain Cooper said that. I said, 'I will get my coat and go.' I didn't make any threats against him at that time. I never made any threats against McLain Cooper. I never used any weapon on him. I never had any trouble with him other than the trouble I have just referred to. During this time my wife was in the house, and she wanted to go to town that day; so when I started to the house to get my coat, I got about half way to the house and there is where he shot me, and she come around, she had to come around the old bunk house to see where we were at the barn, you know, and she was going to find out about the team, and when she come around and looked up there, McLain was standing there looking at me with the gun in his hand; I was lying down then and he had shot me. That morning McLain Cooper and I and my wife and John Hulet, the witness who is now in jail, and my ten-year-old step-

daughter and my boy, about six years old, were on the farm that morning. George wasn't there that morning. When that last shot was fired, I was going to the house after my coat—from the barn to the house—I was about half way. McLain Cooper come along behind, and he was walking up on a kind of a ridge, and I got about half way to the house when he shot. He had the gun in his hand during all this time, every time I see him he had that gun in his hand. I didn't see him shortly before he fired the last shot. I started for the house for my coat, and I got down quite a ways before he caught up with me, and I didn't expect him to shoot or anything, and I wasn't looking. Just as soon as he shot he walked around me, and he says, 'I have plenty more—I have got plenty more;' that is all he said. He fired four shots that morning to my knowledge and it was the fourth shot that dropped me. When I started for the house, John Hulet was putting the team in the barn. He had a team hitched up and he was putting them in the barn. The barn is, I should judge, about 75 yards from the house; it might be a little bit the other way. The barn is north and a little bit west from the house. I don't think McLain Cooper remained on the farm over five or ten minutes after he had shot me; until he got his team. I didn't hear him say anything after the shooting, except what I have told, and I told him to tell Hulet to help me in the house, and I heard him say to Hulet, 'There is a fellow down there wants you to help him in the house.' Just after the shooting my wife come out and she see him with the gun and she hollered to me, 'Are you shot, Frank?' and I says, 'Yes,' and I says, 'Phone for a doctor.' I didn't see whether McLain Cooper had the gun in his hand when I told him to tell John Hulet to help me in the house; he had the gun with him, he had no place to put it. We had no trouble that morning outside of this shooting—not a word—and he never asked me to leave the farm until that morning, and there never was a word in the world about settlement. . . . I was conscious shortly after I was shot—I was always conscious, and I remember everything as well as I am sitting here. Hulet didn't interfere when we had this scrap on the evening of the 10th; he just talked to us. McLain promised to be good and get his supper that night, and then I let him up immediately. There was nothing further said or done after we got up; there was no further trouble until I was shot. After this scrap McLain Cooper got up and went in the sheep

shed for a few minutes, and he walked down to the house and stepped inside the door and walked out. The two of them started toward the Sutton farm that night; I couldn't say whether they ever got there or not. . . . When he fired the shot that struck me and dropped me to the ground, he was walking behind me and a little bit to the left side. I was walking toward the house and he come up behind me; only a little bit on the left side. I don't think he was over 10 feet away from me when he shot. He didn't say anything when he fired that shot; never said a word when he was walking behind me. I was going to the house to get my coat and leave the farm. I was going to take my coat and leave word for my wife to pack up and I would help move after the trouble was over. . . . I made no threats against McLain Cooper when I went to the house from the barn that morning; there wasn't a word spoken. I didn't intend to get any weapon; I intended to get my coat and get out of there and leave, and that is all I intended to do. I never had any trouble in particular with any of the men. . . . I never had any trouble with McLain Cooper about the men. I heard the gun report when I dropped, at least that is what I thought I heard, you know. McLain Cooper was right behind me, and then he walked right around me. I went with my head that way, and he walked right around me, and he says, 'I got plenty more.' He had the gun in his hand, and he is the one that shot me."

The court gave the following instructions:

"The liability of the master for intentional acts which constitute legal wrongs can only arise when that which is done is within the real or apparent scope of the master's business. It does not arise where the servant has stepped aside from his employment to commit a wrong which the master neither directed in fact, nor could be supposed from the nature of his employment to have authorized or expected the servant to do; and where a servant steps aside from the performance of the business for which he was employed by his principal and embarks upon a matter of his own, the principal is not liable for the consequences of the agent's act while so engaged. If, while engaged in the execution of the employment of the principal, he so conducts himself, whether negligently or maliciously, so as to injure another, his principal will be liable. If, however, he forsakes such employment, and purely, for his own benefit or to gratify some personal hate, does an act uncon-

nected with the service of his principal, the latter—that is the principal —is not responsible for its consequences, and as applied to this case the sharp question of dispute which you are to determine is whether McLain S. Cooper while so employed as the agent of his father did step aside from the performance of the business for which he was employed by his principal, and embarked upon a matter of his own, either to avenge some supposed wrong, or for any other reason be that reason whatsoever it may, if it was unconnected with the business for which he was engaged and in which he was at the time acting. It will be for you to say in this case whether when McLain fired the fatal shot he was still in the act of discharging the man Ross from the employment of his father. . . . The defendant claims that when Ross said that he would leave that that of itself settled the matter and fixed the relations as between the parties, so that McLain had accomplished in full such discharge, and therefore any act after that statement on the part of McLain Cooper, and that point of time, could not have been in furtherance of his father's business; while the plaintiff insists that such point of time does not mark the boundary line of McLain S. Cooper's authority to act, but that the whole transaction was a part of an entire act of discharging said Ross and occurred without giving the said Ross the slightest chance to leave said farm and employment peaceably, but while ejecting him therefrom. This sharply disputed question of fact is for you to determine,—that is to say, from the evidence which has been offered 'you are to conclude just when McLain S. Cooper was acting for his father within the scope of his employment, and when he acted for himself. . . ."

"As I have said before if McLain Cooper forsook his employment purely for his own benefit or to gratify some personal hate, and shot Ross, then his father would not be liable. I cannot impress too strongly upon the minds of the jury that great importance of determining just when the act of discharge was complete, because this case must go one way or the other measured from such point of time; for, whenever the servant stepped aside from his master's business for however short a time and committed a wrong not connected with such business, the relation of master and servant is suspended. . . . If you find from the evidence, that at the time of the shooting Ross, McLain Cooper was in the act of discharging Ross, then I charge you as a matter of

law that Harry J. Cooper is liable for the methods employed by Mc-
Lain Cooper in so discharging said Ross."

. These instructions are correct. But was there any substantial proof
to warrant such instructions? If the evidence can be said to present
a basis for them, the verdict should stand; if not, it must fall.

With these issues in mind, the evidence will be scrutinized. It will
be assumed here as it was assumed on trial, that the right to discharge
Ross necessarily carried with it the right to use reasonable force to
eject him from the premises if necessary, as a responsibility naturally
following from the exercise of the right to discharge. Penas v. Chicago,
M. & St. P. R. Co. 112 Minn. 203, 30 L.R.A.(N.S.) 627, 127 N. W.
926. Although upon this question there seems to be some conflict in
the authorities, whether the presumption of right to use force can be
indulged here without proof. Labatt, Mast. & S. § 2534. The question
then resolves to whether Cooper killed Ross in discharging him from
defendant's employment, or an incident to effecting such discharge or
in ejecting Ross from the premises afterward. If so, or if there is
sufficient evidence to fairly warrant that deduction, the verdict must
stand. But if McLain Cooper had no such intent, but merely executed
his own design to injure, or without any definite purpose shot in reck-
less disregard of whether or not he killed Ross, the verdict should
be set aside. And this, too, even though Cooper used as a pretense or
as an excuse therefor his right and authority to discharge Ross. If the
servant "is authorized to use force against another when necessary in
executing his master's orders, the master commits it to him to decide
what degree of force he shall use; and if, through misjudgment or
violence of temper, he goes beyond the necessity of the occasion and
gives a right of action to another, he cannot, as to third persons, be
said to have been acting without the line of his duty, or to have departed
from his master's business. If, however, the servant under guise and
cover of executing his master's orders, and exercising the authority con-
ferred upon him, wilfully and designedly, for the purpose of accom-
plishing his own independent, malicious, or wicked purposes, does an
injury to another, then the master is not liable. The relation of master
and servant, as to that transaction, does not exist between them. . . .
And when it is said that the master is not responsible for the wilful
wrong of the servant, the language is to be understood as referring to

an act of positive and designed injury, not done with a view to the master's service, or for the purpose of executing his orders." Rounds v. Delaware, L. & W. R. Co. 64 N. Y. 129–136, 21 Am. Rep. 597, 8 Am. Neg. Cas. 536, which is, as was said in Illinois C. R. Co. v. Latham, 72 Miss. 32, 16 So. 757, approved "as an admirable statement of the law." This New York case has been quoted from and approved in Galehouse v. Minneapolis, St. P. & S. Ste. M. R. Co. 22 N. D. 615, 47 L.R.A.(N.S.) 965, 135 N. W. 189; and see Clancy v. Barker, 69 L.R.A. 653, 66 C. C. A. 469, 131 Fed. 161, 16 Am. Neg. Rep. 664, and hotel liability case. See also the well-reasoned case of Penas v. Chicago, M. & St. P. R. Co. 112 Minn. 203, 30 L.R.A.(N.S.) 627, 140 Am. St. Rep. 470, 127 N. W. 926.

What, then, was McLain Cooper's intent that morning in doing the things he did? Is it a fair inference under the proof that he intended by such acts to accomplish the discharge of Ross, and that he shot Ross in furtherance thereof? Or was he engaged in wreaking vengeance and doing Ross injury? Giving full faith and credence to every statement in the dying declaration of Ross, it tends to entirely exculpate defendant from liability. He repeats that the slight difficulty of the night before the shooting was the first trouble he had ever had with young Cooper. Hence, it must be that Cooper had no reason for enmity and held no grudge against Ross, and that, as Ross asserts, the trouble really began that night. This comparatively trivial affair was the provocation and moving cause of the occurrence early next morning. Nothing intervened between the night before and 7 o'clock in the morning, when, as Ross says, he "ran into the gun" in the hand of Cooper, in the barn, accompanied with his threat, "I'm going to shoot you," followed with immediate action in execution of such declared intent by the taking of two shots at Ross while the latter's back was turned toward him, as he was getting out of sight; pursuit followed, and an instant later a third shot was taken at Ross in the sheep shed. Ross then realized that young Cooper meant what he said when he declared he was going to shoot him. He in effect said so to Hulet in the words, "it is getting too hot here for me." Up to that time there had been no attempt at discharge of Ross from defendant's employment; not a word said about that, but instead his every move up to that moment evidenced a deliberate premeditated purpose and intent to do Ross great

bodily injury. A felony had been committed by Cooper upon Ross at this stage of the proceeding, to wit, an assault with a dangerous weapon with intent to do great bodily injury, if not an intent to kill him. Were these facts before a trial jury upon indictment for such crime, the jury might properly be instructed that it must be presumed that Cooper intended the probable and necessary consequence of such unlawful acts. Up to this point it must be held as a matter of law unless something subsequently occurred to otherwise characterize to the contrary the acts of Cooper, that he was not acting for the defendant nor in behalf of anyone except himself; that he had not his master's business in mind, but had acted independently and of his own malice, under a desire to avenge himself presumably of what Ross did to him the night before. The motive actuating his conduct, the acts themselves, and the intent to be derived from them, and his statement, with all surrounding facts, clearly establish that at the commencement of the shooting and throughout his first attempt to do Ross great bodily harm or kill him, there was nothing upon which liability against his employer could be predicated. And during the following interval at the cessation of his first malicious attack with a deadly weapon, and upon the advice of the hired man, Ross throws up his hands in acknowledgment of his helplessness and in token of his surrender, and inquiries of his assailant what is wanted, to which Cooper replies, "I want you to leave the place." To this Ross agreed and says, "I will get my coat and go." After an interval of time Ross started for the house, as he says, to tell his wife to pack up and get ready to move. He had walked 160 feet, nearly two thirds the way to the house, when without any warning or another word spoken, with Ross walking away from Cooper and with his back to him, Cooper overtook and shot Ross through the middle of the back with the first shot at that time fired. Ross fell to the ground, Cooper with the gun in hand walked around Ross, and exclaimed to him, "I have plenty more—I have got plenty more," and Ross says, "That is all he said."

These are the facts as narrated by Ross, and the only evidence bearing on the shooting. It establishes the commission of a cold-blooded deliberate killing with malice aforethought, with every ingredient present of murder in the first degree, including a deliberate and premeditated intent to kill; to do exactly what was done. The expression, "I

have got plenty more," is indicative of a frame of mind to shoot again if necessary a man already mortally wounded. It is contrary to fact and every reasonable presumption to say that this was done in the execution of and in the furtherance of the master's business, the mere discharging of Ross from the master's employment, or ejecting him from the premises or facilitating it. It is difficult to arrive at any conclusion upon any reasonable probability of purpose and intent in Cooper upon which it can be said that he intended to do any act toward discharging Ross in thus shooting him. On the contrary every reasonable presumption from the evidence must be that Cooper was in a frenzy of rage imbued with bitter revengeful hatred, and maliciously bent on doing Ross injury. With such intent, and for such purpose, he had armed himself during the night, and in the morning at once proceeded to do what he had set about, that is, injure or kill the party with whom he had quarreled the night before; and that in so doing he had no intent nor even thought about discharging Ross.

It may be assumed, however, that when Ross was told to leave the place Cooper was for the time exercising the powers of the master. It does not follow that, upon renewal of the malicious assault, that he was then continuing to perform the master's business. The contrary is the record, Ross says, "I started for the house for my coat, and got down quite aways before he caught up with me, and I didn't expect him to shoot or anything, and I wasn't looking." The map in evidence establishes the distance traveled during the interval as at least 160 feet. It was 159 feet from the nearest corner of the sheep shed to where Ross fell. The situation is analogous to where a brakeman or conductor after ejecting a passenger leaves the train at such a distance and in pursuit of his own quarrel, maliciously assaults another. Such an assault is deemed to be the personal act of a servant, and not the act of the master. "Where an appreciable interval intervenes between the acts of protection which are exercised by persons in the guarding of property of their employers and a malicious assault which they afterwards commit, the assault will be deemed to be a personal act of the servant, and not an act of the employer." Syllabus in Kinnonen v. Great Northern R. Co. 34 N. D. 556, 158 N. W. 1058, citing Spencer v. Kelley (C. C.) 32 Fed. 838; Roberts v. Southern R. Co. 143 N. C. 176, 8 L.R.A.(N.S.) 789, 55 S. E. 509, 10 Ann. Cas. 375, to which might

be added Illinois C. R. Co. v. Latham, 72 Miss. 32, 16 So. 757; Firemen's Fund Ins. Co. v. Schreiber, 150 Wis. 42, 45 L.R.A.(N.S.) 314, 135 N. W. 507, Ann. Cas. 1913E, 823. "There are numerous cases holding that an assault is to be deemed the personal act of the servant where there is an appreciable interval between the performance of the master's work and the assault." Annotator's note in 9 L.R.A.(N.S.) 475. And there was here clearly such an interval between the order to Ross to leave the place and the homicide later and occurring 50 yards away. And it must not be overlooked that the rule of exceptional liability of common carriers for servants' acts toward patrons and guests is here absent. To recover, the doctrine of *respondeat superior* must apply. No good reason exists why, where the master's liability hangs on a more slender thread under the doctrine of *respondeat superior* than in cases against common carriers for assaults upon its invitees, that the appreciable interval here present between the alleged act of discharge of the employee and the renewal by pursuit followed by assault, should not warrant the application of said presumption of law that under the facts the subsequent assault was but the personal act of the servant, and was not an act performed for the employer.

Most certainly it is a dangerous rule of perhaps far-reaching consequences that would be declared by this precedent should the employer be held in damages for this murder committed by the employee under the circumstances in evidence. It is going beyond all rules of liability to permit such a bare conjecture, that the homicide was done in furtherance of any duty to the master, to stand as a finding of fact, where as here a wilful, deliberated, premeditated killing resulted, and where every act done bespoke a defined purpose and intent in the assailant, born of his own malice to injure or kill another.

That the cause of the quarrel of the night before was the milking of the cow or delaying supper, and concerned the business of the master, is wholly immaterial. That business was a closed incident, having no relation in law to subsequent events, except as it furnished the motive and engendered the hatred that gave vent in murder the next morning. Alabama & V. R. Co. v. Harz, 88 Miss. 681, 42 So. 201, and Lotz v. Hanlon, 217 Pa. 339, 10 L.R.A.(N.S.) 202, 118 Am. St. Rep. 922, 66 Atl. 525, 10 Ann. Cas. 731; Steffen v. McNaughton, 142 Wis. 49, 26 L.R.A.(N.S.) 382, 124 N. W. 1016, 19 Ann. Cas. 1227; Danforth
38 N. D.—13.

v. Fisher, 75 N. H. 111, 21 L.R.A.(N.S.) 93, 139 Am. St. Rep. 670, 71 Atl. 535; all automobile chauffeur cases; McCarthy v. Timmins, 178 Mass. 378, 86 Am. St. Rep. 490, 59 N. E. 1038, where a three-minute "appreciable interval" absolved the master from liability. The cases cited by respondent, *viz.,* Avondale Mills v. Bryant, 10 Ala. App. 507, 63 So. 932; McKeon v. Manze, 157 N. Y. Supp. 623; Scibor v. Oregon-Washington R. & Nav. Co. 70 Or. 116, 140 Pac. 629, all recognize the general rules of law here applied, but refuse them application under the particular facts of each case. Missouri seems inclined toward a rule of its own, one of extreme liability of the master in such cases. Whimster v. Holmes, — Mo. —, 164 S. W. 236 (another automobile chauffeur case). This is mentioned because much is said in respondent's brief about the trouble beginning over the business of the master.

For the purposes of this decision placed upon the facts recited in the dying declaration, it has been assumed that such declaration is admissible in this civil action over all objections taken. Its admissibility is not determined, but is assumed as unnecessary of decision here. However, it may be observed that beyond all question the great weight of precedent is against the admission of dying declarations in civil cases. Against admission see Barfield v. Britt, 47 N. C. (2 Jones, L.) 41, 62 Am. Dec. 190; Jackson ex dem. Coe v. Kniffen, 3 Johns. 31, 3 Am. Dec. 390, in which Justice Kent participated; Thayer v. Lombard, 165 Mass. 174, 52 Am. St. Rep. 507, 42 N. E. 563; People v. Hodgdon, 55 Cal. 72, 36 Am. Rep. 30; People v. Stison, 140 Mich. 216, 112 Am. St. Rep. 397, 103 N. W. 542, 6 Ann. Cas. 69; State v. Meyer, 64 N. J. L. 382, 45 Atl. 779; Daily v. New York & N. H. R. Co. 32 Conn. 356, 87 Am. Dec. 176, and other cases cited in extensive note in 56 L.R.A. 353, and Bionto v. Illinois C. R. Co. 125 La. 147, 27 L.R.A.(N.S.) 1030, 51 So. 98; and Yates v. Huntsville Hoop & Heading Co. — Ala. —, 39 So. 647 and Escalier v. Great Northern R. Co. 46 Mont. 238, 127 Pac. 458, Ann. Cas. 1914B, 468. For admission see Thurston v. Fritz, 50 L.R.A.(N.S.) 1167 and note (91 Kan. 468, 138 Pac. 625).

There was no issue of fact under the evidence upon which, under the instructions given and the law applicable, the defendant could be held liable for the consequences of young Cooper's felonious conduct,

and the motion for judgment notwithstanding the verdict should have been granted. The judgment appealed from is ordered reversed, and judgment of dismissal is directed to be entered accordingly.

## On Petition for Rehearing.

PER CURIAM. In this case a rehearing was ordered and had before the court as now constituted; and, after a full and careful consideration of the questions involved, a majority of the court is of the opinion that the former decision prepared by Mr. Justice Goss is correct, and must stand.

The proposition has been advanced that McLain Cooper was a vice principal, and that therefore Harry J. Cooper would be responsible for the wrongful acts committed by him. It is clear that McLain Cooper was a superior servant or vice principal. In fact, this proposition has never been denied by anyone. But it seems equally clear that this fact does not in any manner change the legal principles upon which defendant's liability in this case must be determined. A servant represents and acts for the master in the performance of those duties which have been intrusted to him. And when a master has delegated to his servant certain duties to perform, or intrusted him with certain business to transact, the master becomes liable for the acts of this servant in the course of such employment. When a master employs a servant to supervise, oversee, give orders to, and generally manage, other servants in the performance of certain work, he becomes what is known as a superior servant or vice principal, and represents his master in his dealings with the subordinate servants in the course of the work to be performed. And the courts have generally held that, in the performance of such duties, the superior servant or vice principal represents his master, and is therefore not a fellow servant, so as to exempt the master from liability under the fellow servant doctrine. And it is therefore generally held that the master is liable to subordinate servants for injuries sustained by reason of any act performed, or duty neglected, by such superior servant within the course of his employment. The mere engagement of a superior servant or vice principal does not, however, render a master liable for all his acts. The liability of the master still depends upon whether the acts upon which liability are predicated were incidental to the discharge of the functions of the vice principal. That is, the acts complained of must have some

relation to the normal functions of the superior servant, and must have been performed within the course of his employment or in connection with some duty expressly or impliedly delegated to him by his principal, or have some relation to the business or interest intrusted to him by his principal. See Labatt, Mast. & S. § 1466. . In the case at bar no one questions the defendant's liability, provided the act involved was performed by McLain Cooper within the course of his employment or in the performance of business intrusted to him. This fact was clearly recognized in the former opinion. But we do not believe that there is any evidence in this case from which it can be found that McLain Cooper, when he shot Ross, was acting within the course of his employment, in the performance of any duty expressly or impliedly delegated to him, or in the furtherance of the defendant's business or interest intrusted to him.

The proposition has also been advanced that the defendant was negligent in intrusting the management of the farm to McLain Cooper. While there were certain allegations in the complaint tending to predicate liability on this ground, it was conceded on the oral argument that no evidence was introduced to substantiate these allegations. And an examination of the record shows that not one word of testimony was offered tending to show that McLain Cooper had ever during his entire life by any word, act, or deed shown himself unfitted for the position in which he was placed by his father. Under these circumstances, not only was this ground of liability not substantiated by evidence, but it must be assumed that the plaintiff was unable to produce any evidence in support of such alleged ground of liability.

It will be noted from the former opinion that the question of the admissibility of the so-called dying declarations was not expressly passed upon, although it was intimated that such declarations are inadmissible in civil actions. The principal reason for the admissibility of dying declarations is what has been termed the "principle of necessity;" that is, if such declarations were not admitted in evidence, it would be impossible to produce any other evidence from the same source, that is, from the declarant. Wigmore, Ev. §§ 1421, 1436. Manifestly, this reason does not exist and cannot be invoked for the introduction of the dying declarations in the instant case. The shooting took place on March 11, 1911. The so-called dying declaration was

subsequently prepared some two or three weeks before it was signed. It was finally signed by the declarant on June 29, 1911. Under our laws, provision has been made, not only for the taking of depositions in pending actions, but for the perpetuation of testimony in probable or possible actions. Comp. Laws 1913, § 7927. It appears from the record in this case that the dying declaration was first taken by the then court reporter in the form of answers given to questions propounded by plaintiff's attorney, and that subsequently the statements so elicited were prepared in narrative form and submitted to, and gone over by, the declarant while in the possession of all his faculties, and eventually signed by him on June 29, 1911. Manifestly, plaintiff could have had this testimony perpetuated in the manner provided by statute with no greater hardship to the declarant than that to which he was subjected in the preparation of the dying declaration, and with no greater expense to plaintiff. While the rule that dying declarations are inadmissible in civil cases has been criticized, it is nevertheless true that such rule has been established and settled by the overwhelming weight of judicial authority in this country, and it is now so well established that it would in effect constitute legislation on the part of the courts to change it. In fact, Professor Wigmore in concluding his criticism of the rule recognizes this to be so; as he says: "They (the limitations) should be wholly abolished *by legislation.*" Wigmore, Ev. § 1436. It may also be observed that the courts and legal writers who have criticized the rule have apparently failed to consider the fundamental distinction between civil and criminal actions with respect to the reception of evidence therein. In pending civil actions the testimony of witnesses may be taken by deposition. In anticipated civil actions the testimony of witnesses may be perpetuated. But not so with respect to criminal actions, as the Federal Constitution, and the Constitutions of most of the states, secure to the accused the right to be confronted with the witnesses against him. 12 Cyc. 543. In this state the right to take depositions in a criminal action is granted to a defendant therein only. (Comp. Laws 1913, §§ 11039–11062.) In the case at bar, for instance, the testimony of Ross could not have been taken either by deposition or under proceedings for its perpetuation so as to render it admissible under the laws of this state in the criminal action against McLain

Cooper, but such testimony could have been taken—and there was ample time in which to do so—for use in this or any other civil action.

We are agreed that the former opinion must stand.

GRACE, J. (dissenting). The case presented to this court involves an appeal from the final judgment, and also from an order denying motion for a judgment *non obstante*.

The case is one of great importance and vast and far-reaching consequence; and, in order that a correct and full understanding of the issues involved may be readily comprehended, we deem it advisable to set out in full the pleadings. The complaint is as follows:

"The plaintiff for a cause of action against the defendant herein complains and alleges:

"That the defendant Harry J. Cooper for a great many years prior to, and at the time of, the commission of the grievances hereinafter mentioned, owned, used, and operated a large farm known as the West Cooper farm, situated, lying, and being in the county of Traill, in the state of North Dakota, and particularly described as follows, to wit: All of sections nine (9) and seventeen (17), and the north half (N.½) of section twenty (20), in township one hundred forty-five (145), north of range fifty-one (51), west of the fifth principal meridian.

"That the said defendant Harry J. Cooper, during all the times herein mentioned, was also the owner of a great deal of personal property, by him used in the operation and management of said farm, and consisting of horses, cattle, sheep, hogs, and other domestic animals, and farm implements and machinery of great variety, and including particularly threshing machines, binders, drills, plows, mowers, wagons, buggies, and other like property.

"That said defendant Harry J. Cooper is also the owner of other real and personal property in great abundance, the particular description of which is to this plaintiff unknown.

"That the value of the real and personal property so owned by the defendant, Harry J. Cooper, exceeds the sum of $100,000.

"That the defendant McLain S. Cooper is the son of said Harry J. Cooper, and he also is the owner of an abundance of property, the

particular description, worth, and value of which is to this plaintiff unknown.

"That on the 13th day of December, A. D. 1910, the defendant Harry J. Cooper employed his said son, the said McLain S. Cooper, to manage and control the operation of the so-called 'West Cooper farm,' described in the first paragraph of this complaint, and hired and engaged him to take charge of, care for, guard, protect, handle, and operate the same and all the personal property thereon, thereunto belonging and used in connection therewith; and at said time, for such purpose, did install him, the said McLain S. Cooper, in full and complete possession, and place him in supreme and active control, charge, and custody thereof, with full and complete authority, power, and jurisdiction to hire, employ, and discharge such assistants, servants, agents, and employees as he, the said McLain S. Cooper, might deem necessary or convenient; and did in all things grant and intrust unto the said McLain S. Cooper as full and complete power and authority as he the said Harry J. Cooper had in and about the premises.

"That at the time of the commission of the grievances hereinafter mentioned, and for more than two years prior thereto, this plaintiff's husband, James Franklin Ross, for hire and reward, was the servant and employee of the said Harry J. Cooper, in, on, and about the said West Cooper farm, and was, during said time, there faithfully engaged in the performance of his duties in connection with said farm, as superintendent thereof, and since the said 13th day of December, A. D. 1910, so worked and labored, under the charge and authority of the said McLain S. Cooper, by virtue of the employment of the said McLain S. Cooper by his father, as set forth in the 6th paragraph hereof, and so continued to render service as aforesaid until the 11th day of March, A. D. 1911.

"That on the said 11th day of March, A. D. 1911, the said McLain S. Cooper, in the exercise of the power and authority so delegated to, and vested in, him, by the said Harry J. Cooper, did discharge the said James Franklin Ross from the said employment of the said Harry J. Cooper, and while so exercising such power and authority, and while the said James Franklin Ross was peaceably preparing to leave, and without giving him, the said James Franklin Ross, the slightest chance to leave said farm and employment peaceably, proceeded to eject him

therefrom, and while so engaged, and while acting for the said Harry J. Cooper, and within the scope of his employment, and exercising the powers and authority so conferred upon him, he the said McLain S. Cooper, in utter disregard of the safety of the said James Franklin Ross, did, without the slightest cause, excuse, or justification, with unnecessary violence, wilfully, intentionally, maliciously, and unlawfully, assault and with force and violence shoot and mortally wound the said James Frankin Ross, with a revolver then and there loaded with gunpowder and leaden bullets, and then and there, and for that purpose, in his the said McLain S. Cooper's hands had and held, and by him shot off and discharged at, to, against, into, and upon the person and body of him, the said James Franklin Ross, in the thoracic region of his spine, and by force of the gunpowder aforesaid, with the leaden bullets aforesaid, out of the revolver aforesaid, by the said McLain S. Cooper so discharged and shot off as aforesaid, did strike and penetrate the person and body of him, the said James Franklin Ross, in the said thoracic region of his spine, thereby and therewith inflicting upon the said person and body of him, the said James Franklin Ross, in the said thoracic region of his spine, a mortal wound, of which mortal wound the said James Franklin Ross, from the said 11th day of March, A. D. 1911, until the 6th day of August, A. D. 1911, did languish, and languishing did live, and on which said 6th day of August, A. D. 1911, he, the said James Franklin Ross, of the mortal wound aforesaid died.

"That during all the times herein mentioned the defendant McLain S. Cooper was a man of violent temper, quarrelsome disposition, and a turbulent character, accustomed to carry firearms and other dangerous weapons, and disposed to use them on, and otherwise maltreat, both man and beast.

"That the defendant Harry J. Cooper on the said 13th day of December, A. D. 1910, when he placed the said McLain S. Cooper in supreme authority and control on said farm, and over said James Franklin Ross, well knew that his said son, the said McLain S. Cooper, was possessed of such temper, disposition, character, and habits, and he has so known all of such facts during all the times herein referred to.

"That since the commission of the grievances hereinbefore referred to, up to, and after the death of the said James Franklin Ross, the defendant Harry J. Cooper has in all things and in every manner,

wilfully and maliciously, by word and act, ratified the act of his said son, the said McLain S. Cooper, in so discharging, shooting, and killing the said James Franklin Ross, and has in every and all ways wilfully and maliciously, by word and act, approved thereof.

"That the plaintiff herein is the surviving wife of the said James Franklin Ross, and at the time of his death she was, and for more than six years prior thereto, had been, his lawful wife.

"That at the time of his death said James Franklin Ross was forty-one years, five months and eighteen days of age; and at the time of the shooting aforesaid, and for many years prior thereto, he had been capable of, and was earning an income of from $1,500 to $2,000 per year.

"That, besides this plaintiff, his widow, the said James Franklin Ross, left surviving him his son Harry, about six years of age, and an adopted daughter, Ethel, about eleven years old.

"That this plaintiff and said children were entirely dependent upon the said James Franklin Ross for their support, sustenance, maintenance, nurture, and education, which has been lost by his death.

"That by reason thereof, they have also lost his company, society, and counsel.

"That the death of her said husband, the said James Franklin Ross, has also caused this plaintiff intense grief, resulting in actual physical illness.

"That by reason of the premises, this plaintiff has been damaged by the death of the said James Franklin Ross as aforesaid in the sum of $50,000.

"Wherefore, plaintiff demands judgment against the defendants: (1) For the sum of $50,000; (2) for her costs and disbursements in this action; (3) for such other and further relief as may seem just and equitable in the premises."

The answer to such complaint is as follows:

"Now comes the defendant Harry J. Cooper, and for his answer to the complaint of the plaintiff herein, admits the allegations of paragraphs 1, 2, 6, 12, and 14 of said complaint.

"Admits that for more than two years prior to the transactions alleged in said complaint to have taken place on the 11th day of March,

1911, James Franklin Ross was the servant and employee for hire of the said Harry J. Cooper, in, on, and about the West Cooper farm, as superintendent thereof, and that after the 13th day of December, 1910, he so worked and labored under the charge and authority of the said McLain S. Cooper, by virtue of the employment of said McLain S. Cooper by his father, and that he so continued to render service until the 11th day of March, 1911.

"Admits that on the 11th day of March, 1911, the said McLain S. Cooper, in the exercise of the power delegated to, and invested in, him by the said Harry J. Cooper, did discharge the said Ross from the employment of the said Harry J. Cooper.

"Admits that on the 11th day of March, 1911, the said McLain S. Cooper, did shoot and mortally wound the said Ross with a revolver then and there loaded with gunpowder and leaden bullets and held in the hands of the said McLain S. Cooper, and by him shot off and discharged at and into the body of the said Ross, in the thoracic region of the spine, thereby and therewith inflicting upon the person and body of the said Ross a mortal wound, of which wound the said Ross subsequently, and on the 6th day of August, 1911, died. But this defendant denies that the said McLain S. Cooper proceeded to eject said Ross from said farm at the time, in the manner or under the conditions and circumstances alleged in said complaint, or at all; and denies that the said McLain S. Cooper assaulted, shot, or wounded the said Ross while engaged in ejecting said Ross from said farm or while acting for this defendant, Harry J. Cooper, or within the scope of his employment, or while exercising any power or authority conferred upon him by this defendant or by virtue of his employment or agency. Denies that he, the said McLain S. Cooper, assaulted, shot, or wounded the said Ross in disregard of the safety of said Ross, or without cause, excuse, or justification; denies that the said McLain S. Cooper assaulted, shot, or wounded the said Ross with unnecessary violence, wilfully, intentionally, maliciously, or unlawfully. But this defendant alleges that the said McLain S. Cooper shot and wounded the said Ross in the lawful defense of his own person, at a time when he believed and had reasonable grounds to apprehend that the said Ross intended to do him great bodily injury, and there was imminent danger of such intention being accomplished.

"Admits that McLain S. Cooper is the son of this defendant, but denies that he is the owner of any property whatsoever.

"Denies that the value of the real and personal property owned by this defendant exceeds the sum of $100,000, and alleges that the value of such property over and above his just debts and liabilities does not exceed the sum of $15,000.

"Denies the allegations of paragraphs 3, 9, 10, 11, 15, 16 and 17 of said complaint.

"Denies that he has any knowledge or information sufficient to form a belief as to the allegations contained in paragraph 13 of said complaint.

"Denies that the plaintiff, by reason of any of the matters or things alleged in said complaint, has been damaged in the sum of $50,000, or in any other sum whatsoever.

"Denies each and every allegation in said complaint contained not hereinbefore admitted, or specifically denied.

"Wherefore, this defendant respectfully asks that the plaintiff's complaint be dismissed, and that he do have judgment against plaintiff for his costs and disbursements herein."

The facts in the case which are material are substantially as follows: The plaintiff, Mary Ross, is the surviving widow of one James Franklin Ross, who formerly lived with her husband upon a farm known as the Cooper farm, near the city of Hillsboro, North Dakota. The plaintiff was born on the 1st day of January, 1878, and on the 11th day of June, 1904, was married to James Franklin Ross. At the time of their marriage Ross was working in a livery stable in Fargo, but later worked on a farm near Argusville, where Mrs. Ross also worked. It seems they had worked on that farm prior to the time of their marriage. Afterwards they worked for a person named Eggert on a farm near Davenport, where Ross was foreman. It appears that in the fall of 1907 Mrs. Ross went to Minnesota near where her people lived at Beaulieau, and she did not see Ross, her husband, until she came to the Cooper farm near Hillsboro in October, 1908. At about such time or shortly thereafter arrangements were made by which Ross and his wife entered the employment of Harry J. Cooper, who is the defendant in this case. Ross became foreman of a large farm which

was owned by Cooper, and Mrs. Ross took charge of the house on such farm and took care of the help about the farm, Cooper furnishing the supplies, and additional help during the threshing season. Mrs. Ross became acquainted with McLain Cooper in 1909, he being at that time about eighteen or nineteen years of age. There were four buildings upon this farm, known as the Cooper farm, at the time of the happening of the events involved in this action, the most northerly one being a large barn, east of which stood a sheep barn, and south of the barn and a little east stood a small one story and a half house called the "bunk house," and immediately beyond stood another small house one and a half stories in height in which Ross and his wife, together with two children, one of whom was adopted, and John Hulet, the hired man, lived. McLain Cooper had a room in the sheep barn, but had his meals with the Rosses at the house. A boy named Tom Fowler slept with McLain Cooper and also took his meals at the Ross house. There was a shed on the south side of the big barn; there was a fence running east and west between the bunk house and the barn, and not far from the bunk house, and a gate opening through this fence at a point near the bunk house. The entrance to the house in which Mr. and Mrs. Ross were living was on the east side, and a small shed was built on the east side of the house, which inclosed the door into the main part of the house, the door of the shed being on the south side.

On the evening of the 10th of March, 1911, there was some trouble between McLain Cooper and James Franklin Ross. There appears to have been some trouble about the milking of a cow and some talk about sending such cow down to the Sutton farm. McLain Cooper and James Franklin Ross on the evening of March 10th seem to have had a personal encounter, which, however, does not appear to have been very vicious and of any great consequence, except there was a clinch and they went to the ground, and Ross appears to have choked McLain Cooper some at this time. On the morning of March 11th, and soon after breakfast, Mrs. Ross heard a shot fired. She went out of the house and through the door on the east side of the main building into the shed, and through the door on the south side of the shed, then around and north along the east side of the shed to the northeast corner of the building in which she lived. When she reached that spot she saw her husband lying alongside the beaten path which leads from the gate

in the fence to the barn door, on the side of the fence toward the barn, but nearer the house than he was to the barn. McLain Cooper, at the time she saw her husband, was standing alongside of him with a revolver in his hand. When Mrs. Ross saw her husband on the ground she called to him and said, "Frank, are you shot?" He answered: "Yes, call Dr. Anderson as quick as you can." She then asked him where he was shot, and he said, in the back. On the morning of the 11th of March, at the barn McLain Cooper fired three shots at Ross, none of which hit Ross. Immediately after this, Ross started for the house, and got about half way to the house. McLain Cooper followed him and shot him in the back, from the effects of which wound Ross subsequently died on the 6th day of August, 1911. McLain Cooper at the time of the shooting of Ross was of the age of about twenty-one years.

We will now proceed to analyze the legal propositions involved in this case. The first question presented to this court is, Are declarations made in extremity, when a person is at the point of death, when death is imminent and certain and the mind is induced by every consideration to speak the truth, and the occasion is so solemn and influencing in its effect as to be considered equivalent to an obligation imposed by an oath administered by a court of justice or one having authority to administer an oath, admissible in the trial of a civil action? While authorities differ materially on this subject, we think the liberal rule, the one founded in reason and justice, and the one tending to establish and promote justice, is the rule that admits dying declarations as proper evidence in either criminal cases or in civil actions, and this even if the exigencies of the case do not require it; that is, even though the matter to which the dying declaration relates might and could be proved by other competent testimony. The theory upon which dying declarations are admitted as competent testimony is that they are part of the *res gestæ*. One of the leading cases holding that such dying declarations are competent testimony as part of the *res gestæ* is Travellers' Ins. Co. v. Mosley, 8 Wall. 397, 19 L. ed. 437. Mr. Justice Swayne, speaking for the majority of the court, said: "In the complexity of human affairs, what is done and what is said are often so related that neither can be detached without leaving the residue fragmentary and distorted. There may be fraud and falsehood as to both, but there is no ground of objection to one that does not exist equally

as to the other. To reject the verbal fact would not infrequently have the same effect as to strike out the controlling member from a sentence, or the controlling sentence from its context. . . . Here the principal fact is the bodily injury. The *res gestæ* are the statements of the cause made by the assured almost contemporaneously with its occurrence, and those relating to the consequences made while the latter subsisted and were in progress. Where sickness . . . is the subject of inquiry, the sickness . . . is the principal fact. The *res gestæ* are the declarations tending to show the reality of its existence, and its extent and character. The tendency of recent adjudications is to extend, rather than to narrow, the scope of the doctrine. Rightly guarded in its practical application, there is no principle in the law of evidence more safe in its results. There is none which rests on a more solid basis of reason and authority. . . . In the ordinary concerns of life, no one would doubt the truth of these declarations, or hesitate to regard them, uncontradicted, as conclusive. Their probative force would not be questioned. Unlike much other evidence equally cogent for all the purposes of moral conviction, they have the sanction of law as well as of reason." In the Encyclopedia of Evidence, vol. II, page 330, we find the following language: "The mental and physical condition of the declarant at the time of the declaration is a very important, consideration in determining whether too great an interval of time has elapsed between the main transaction and the statement; since there must not only be time, but also opportunity, for deliberation. If the declarant was suffering physical pain, or was still under great mental stress as a result of the principal transaction at the time the statement was made, it might be a part of the *res gestæ*, although a considerable interval of time had elapsed, the question being, of course, whether his condition had rendered premeditation impossible or improbable."

The time when the declaration is made is really not of as much importance as the condition of the declarant, which may be such that the desire and opportunity for premeditation and fabrication is entirely precluded; and where a statement has been elicited by questions from a third party, when opportunity for premeditation and fabrication is absent, which is true of the case at bar, such statements have the quality of spontaneity and reliability, and are competent testi-

timony as a part of the *res gestæ* and should be admitted without hesi-
tation. Little Rock, M. R. & T. R. Co. v. Leverett, 48 Ark. 333, 3
Am. St. Rep. 230, 3 S. W. 50; Washington & G. R. Co. v. McLane,
11 App. D. C. 220; Southern R. Co. v. Brown, 126 Ga. 1, 54 S. E.
911; Fish v. Illinois C. R. Co. 96 Iowa, 702, 65 N. W. 995; Alsever v.
Minneapolis & St. L. R. Co. 115 Iowa, 338, 88 N. W. 841; Keyes
v. Cedar Falls, 107 Iowa, 509, 78 N. W. 227; Louisville & N. R. Co.
v. Shaw, 21 Ky. L. Rep. 1041, 53 S. W. 1048; State v. Robinson, 52
La. Ann. 541, 27 So. 129, 13 Am. Crim. Rep. 357; People v. Simp-
son, 48 Mich. 474, 12 N. W. 662; People v. Brown, 53 Mich. 531, 19
N. W. 172; Head v. State, 44 Miss. 731; Elkins v. McKean, 79 Pa.
493; Farris v. State, — Tex. Crim. Rep. —, 56 S. W. 336; Smith
v. State, 21 Tex. App. 277, 17 S. W. 471; Gantier v. State, — Tex.
Crim. Rep. —, 21 S. W. 255; Craven v. State, 44 Tex. Crim. Rep. 78,
122 Am. St. Rep. 799, 90 S. W. 311; Berry v. State, 44 Tex. Crim.
Rep. 395, 72 S. W. 170; Chapman v. State, 43 Tex. Crim. Rep. 328,
96 Am. St. Rep. 874, 65 S. W. 1098; Drake v. State, 29 Tex. App.
265, 15 S. W. 725; Bowles v. Com. 103 Va. 816, 48 S. E. 527; Dixon
v. Northern P. R. Co. 37 Wash. 310, 68 L.R.A. 895, 107 Am. St.
Rep. 810, 79 Pac. 943, 2 Ann. Cas. 620; see Hooker v. Chicago, M.
& St. P. R. Co. 76 Wis. 542, 44 N. W. 1085; Lexington v. Fleharty,
74 Neb. 626, 104 N. W. 1056; DeWalt v. Houston, E. & W. T. R.
Co. 22 Tex. Civ. App. 403, 55 S. W. 534; Murray v. Boston & M. R.
Co. 72 N. H. 32, 61 L.R.A. 495, 101 Am. St. Rep. 660, 54 Atl. 289;
Fish v. Illinois C. R. Co. 96 Iowa, 702, 65 N. W. 995; Crookham v.
State, 5 W. Va. 510; Sutcliffe v. Iowa State Traveling Men's Asso.
119 Iowa, 220, 97 Am. St. Rep. 298, 93 N. W. 90; Springfield Consol.
R. Co. v. Hoeffner, 175 Ill. 634, 51 N. E. 884; State v. Maxey, 107
La. 799, 32 So. 206; Sullivan v. Henry Guth & Co. 148 Ill. App. 538.

The dying declaration in this case is as follows:

"My name is James Franklin Ross. I was born in Cleveland, Ohio,
February 18, 1870. I wasn't there over nine months—less than a year.
My mother died and my father moved away when I was less than a
year old. My father has been dead some years. He died along about
1890, I think. From Ohio we moved to Lafayette, Indiana. We were
there only a short time and went to Missouri. I was something like

four years old when we moved to Missouri. From Missouri we went to Independence, Kansas, where I lived in the country on a farm. My father was a farmer. I left home when I was thirteen years old, and come up to Storm Lake, Iowa, where I worked on a farm. I was at Storm Lake, Iowa, about two years working on a farm all the time. From there I come up to St. Paul and was traveling around through Wisconsin, Minnesota, and Dakota, back and forth, working in the woods and taking in the harvest and threshing, working on farms. I have worked on farms mostly, nearly all my life has been spent on a farm, except winters working in the woods. I came to North Dakota in 1888, I think; in the fall of 1888, for harvesting and threshing. I was in Montana a couple of years teaming, hauling supplies up in the mountains. With the exception of the time that I was in Montana, I have lived in North Dakota, Minnesota, and Wisconsin. During these different times I have worked on a farm in the summer time, and in the winter time in the woods. I am a married man. My wife's name was Mary Terway. We were married in June, 1904; I wouldn't just say the date; it slipped my memory. I have been married only once. I know Harry J. Cooper. I have known him about two years and a half. I worked for him about that long on the farm. He has a farm of his own. He has two sections and a half out here. He did have a quarter right out here. His farm is 2 miles south and about 6 miles west from Hillsboro. The other quarter that he had was a half a mile south and 1 mile west. That is sold. It was sold while I was working on the other farm, the farm I described as being 2 miles south and 6 miles west. Mr. Cooper is a married man, and has a family,— his wife, two daughters, and one son. The son's name is McLain S. Cooper. He lived on this farm, the quarter, the first six months I worked for him, and then he boarded here in town, and then in the spring he sold the quarter, and then he went on to the Sutton farm, where he was superintendent. In 1910 I was on the two places and Harry J. Cooper was on the Sutton farm until February and then he moved to town,—to Hillsboro, and then I chased around from one farm to the other. From about the middle of November, 1910, and on during the time that I was there, he was not at the farm. He was in Florida and Georgia. His wife and youngest daughter were with him. The other daughter is married and living up here at Inkster, North

Dakota. The boy, McLain Cooper, was on the west farm during the time that Harry J. Cooper was down South. He boarded with us on the farm. My wife was working on the Cooper farm. I was foreman there. I was foreman two years. I was not foreman the first six months I was there, but after I had been there six months I was hired as a foreman on the farm. Harry J. Cooper never was on the farm during the time I was foreman, except that he would drive out to the farm once in a while. McLain Cooper, during the time I was foreman on the farm, was there from April, last year, until this spring. I and my folks belonged to the Methodist Church. I was working on the Cooper farm on the 10th day of March. The 11th was the day I quit work about half-past 7. The 10th of March, 1911, was Friday. McLain Cooper was at the farm at that time; he was there taking care of some lambs. Up to the 10th of March, 1911, McLain Cooper and I would sometimes speak to one another and sometimes we didn't. Sometimes he would come along and speak to you and sometimes he wouldn't and pass right along. There was no particular trouble at all before that time. He had a bunch of sheep that he bought; he had a bunch of full-blooded Hampshire sheep, he had about eighty, and they put up a new building for them and they put him up a bedroom for himself, with the sheep. Sometimes he would go away nights and we wouldn't see him next day until 10 or 11 o'clock. I hadn't had any trouble with McLain Cooper during the time I was there up to the 10th of March. During that time I was hired as foreman and I had charge of the farm. On the evening of the 10th of March, 1911, we had some trouble. My wife had been sick quite a while, and he never wanted to go to meals, and every place I ever worked I always had a meal hour, summer and winter. Take it out there, we had our regular hours, and I was down here for Billy Herman four years and a half, 2 miles east of Argusville, where I was straw boss and working on the farm, and we had our regular meal hours. During the time I was at the Cooper farm we had breakfast in the summer time at half-past 5 and supper—well that would depend on where we was working. We had some lands where we would have to go 2 miles. We generally had breakfast half-past 5 and supper generally at about 7. In the month of March, 1911, we had supper at 6 o'clock. The way this trouble started on the 10th of March, 1911, this Jack Hulet was milking—he is the man who

38 N. D.—14.

is now in jail being held as a witness in the case of the State of North Dakota against McLain Cooper,—he was doing the milking, and we had a cow that nobody could milk; I couldn't milk her, and he told McLain that he couldn't. Just before dinner, McLain come to me and asked me if I could send that cow down to the Sutton farm. I told him, after dinner; and so he come around after dinner, and he says, 'You don't need to take the cow down.' He said the kid would milk her. The kid is George, that is the only name he went by there. I understood he was a cousin of the Coopers, but I couldn't say. And so when they started to milk, he couldn't do anything, and he couldn't get no milk from her, and McLain was helping him and they couldn't do anything, and they was mad, jumping around there, but didn't say anything, and that is where you might say, the row started from. So, when I asked him at 7 o'clock if he wasn't going to supper, he said he would go when he damn pleased. My wife was around the house sick and she didn't feel like keeping meals all night, so he said he would get supper when he damned please, and he started toward the door and I started toward him. He looked pretty mad and we clinched right at the door. We laid down on the ice a little bit, and I told him, 'If you want to get up and be a man and go in and get your supper, I will let you up,' and finally he says, 'All right.' While I had him down, he called this George, the kid, to go down and call the sheriff, and I told the kid to keep away from that telephone. So, after this row, him and the kid, they hitched up to drive down, and I won't say whether they both went down to the Sutton farm or not, but they hitched up the team and drove around the corner of the barn, and that is the last that I see them. This was in the evening. It was about 7 o'clock when our trouble came up, and it was about half-past 7 or a quarter to eight when they got started to go to the Sutton farm. When we had this trouble John Hulet come along, and he says, 'Let up, Frank;' I says, 'I ain't hurting him,' I says, 'Any time he wants to get up and behave, I will let him up.' McLain Cooper didn't call for help while we had this trouble, and he didn't call Jack Hulet to come over there. We was working, the two of us, Jack Hulet and I, right close to his sheep shed. He was chopping ice away from the well, pretty close to the water trough. We had so much trouble with the water backing up higher than the water trough, and we finally got the water started under-

neath, and we used to go out evenings to finish this water and was chopping the ice so the water could get away. There was an artesian well there on the place, and that was the cause of our trouble and lots of it. During the trouble with McLain I didn't strike him. I choked him a little, but it never made a mark on him. I didn't have any weapons with me at the time. I didn't make any threats against him at that time, not a thing, and I didn't injure him. I have the prettiest chance in the world if I wanted to, but I didn't want to. I had never made any threats against McLain Cooper during the time that I was there, and I had had no trouble with him up to this time. He had never asked me to leave the farm. I didn't see him again that night after he went to the Sutton farm. All that I did to him was to put him down on the ground and hold him there. He didn't get a scratch. I must have throwed him. We met right at the door, and he was making for me, and I for him, and I catched him. It was all ice and water, and it wasn't much of a trick to throw anyone there, it was so slippery there. There was a fence run west from the sheep-shed door, where we met; it was right up close, there is a gate comes right up to the building, and I think that gate was open all winter. I didn't throw him over the fence, and didn't injure him a bit; there wasn't a scratch on him; I don't think there was a scratch on me. I next saw McLain Cooper, after this scrap, about 7 o'clock or 7:15 the next morning. We had breakfast at 7 o'clock, and we went out to the barn. I went back in the barn and got a pail of feed for the pigs, and when I come to the door, the barn door, I met the gun. McLain Cooper, the son of Harry J. Cooper, held that gun. He says, 'I am going to shoot you.' He threw the gun in my face and he said, 'I am going to shoot you, Frank,' I says, 'Go ahead and shoot,'—something like that, and I walked down a little further and I went into the other door and, getting down to this door, he shot at me twice—that is the sheep-shed door—he shot at me twice; when I got down in the sheep shed he shot again. When he fired the third shot I was inside. Nobody said anything during the time that he was firing. The first two shots my back was to him, and when I got to the shed I wouldn't say. None of these shots hit me. The first two struck the barn, I couldn't swear to that. The only thing—there is witnesses that saw the bullet holes in the building, but I couldn't say for I never got back to the barn. I

think when the third shot was fired I was emptying the feed out. Up to this time he never said a word. The only remark I heard was, 'I am going to shoot you'—that was the first thing. Then John Hulet hitched up the team and he was just going around the corner of the barn, and I got back there, and I says, 'Put your team in the barn, Jack. It is getting too hot here for me.' 'Well,' Jack says 'Throw up your hands—why don't you throw up your hands and find out what he wants.' So I did; I throwed up my hands, and I says 'What do you want?' He says, 'I want you to leave the place.' That is, McLain Cooper said that. I said 'I will get my coat and go.' I didn't make any threats against him at that time. I never made any threats against McLain Cooper. I never used any weapon on him; I never had any trouble with him other than the trouble I have just referred to. During this time my wife was in the house and she wanted to go to town that day, so when I started to the house to get my coat, I got about half way to the house and there is where he shot me, and she come around, she had to come around the old bunk house to see where we were at the barn, you know, and she was going to find out about the team, and when she come around and looked up there, McLain was standing there looking at me with the gun in his hand; I was lying down then and he had shot me. That morning McLain Cooper and I and my wife and John Hulet, the witness who is now in jail, and my ten-year old step-daughter and my boy about six years old, were on the farm that morning. George wasn't there that morning. When that last shot was fired, I was going to the house after my coat—from the barn to the house—I was about half way. McLain Cooper come along behind, and he was walking up on a kind of a ridge, and I got about half way to the house when he shot. He had the gun in his hand during all this time, every time I see him he had that gun in his hand. I didn't see him shortly before he fired the last shot. I started for the house for my coat, and I got down quite a ways before he caught up with me, and I didn't expect him to shoot or anything, and I wasn't looking. Just as soon as he shot he walked around me, and he says, 'I have plenty more—I have got plenty more;' that is all he said. He fired four shots that morning, to my knowledge, and it was the fourth shot that dropped me. When I started for the house, John Hulet was putting the team in the barn. He had a team hitched up and he was

putting them in the barn. The barn is, I should judge, about 75 yards from the house; it might be a little bit the other way. The barn is north and a little bit west from the house. I don't think McLain Cooper remained on the farm over five or ten minutes after he had shot me; until he got his team. I didn't hear him say anything after the shooting except what I have told, and I told him to tell Hulet to help me in the house, and I heard him say to Hulet, 'There is a fellow down there wants you to help him in the house.' Just after the shooting my wife come out, and she see him with the gun and she hollered to me, 'Are you shot, Frank?' and I says, 'Yes,' and I says, 'Phone for a doctor.' I didn't see whether McLain Cooper had the gun in his hand when I told him to tell John Hulet to help me in the house; he had the gun with him, he had no place to put it. We had no trouble that morning outside of this shooting,—not a word,—and he never asked me to leave the farm until that morning, and there never was word in the world about settlement. When Harry J. Cooper left the farm he didn't give me any instructions as to the running of the farm. He just called me up by phone and he told me, 'Hello,' he says, 'I wanted to come out to see you, but I couldn't get out,' he says, 'I am going to take the evening train. Nothing was said between us as to McLain Cooper at that time. I was in charge of the farm. I was hired by the year to take charge of the farm in the summer and help to take care of the stock in the winter. Hulet had worked for Cooper not quite a month. He worked on the Sutton farm about three weeks, and they brought him from the Sutton farm. I was conscious shortly after I was shot,—I was always conscious and I remember everything as well as I am sitting here. Hulet didn't interfere when we had this scrap on the evening of the 10th; he just talked to us. McLain promised to be good and get his supper that night, and then I let him up immediately. There was nothing further said or done after we got up; there was no further trouble until I was shot. After this scrap McLain Cooper got up and went in the sheep shed for a few minutes, and he walked down to the house and stepped inside the door and walked out. The two of them started toward the Sutton farm that night; I couldn't say whether they ever got there or not. There was only one telephone in the house at that time. Jack and I was both in the house when he come in, and he didn't use the telephone after the trouble. The tele-

phone was located on the west side of the house, about the center of the room. When he fired the shot that struck me and dropped me to the ground he was walking behind me and a little bit to the left side. I was walking toward the house and he come up behind me; only a little bit on the left side. I don't think he was over ten feet away from me when he shot. He didn't say anything when he fired that shot; never said a word when he was walking behind me. I was going to the house to get my coat and leave the farm. I was going to take my coat and leave word for my wife to pack up and I would help move after the trouble was over. My coat was in the house. John Hulet didn't have any weapon that morning. Nobody else on the farm had any weapon that morning, or at any time that I know of. When Hulet was told he come and dragged me down to the house. The doctor was called,—Doctor Anderson. I told my wife to call him, and she did and he came. I couldn't say how long after the shooting he was there. He carried me in and laid me down on the cot, I couldn't say the length of time, for I was in terrible pain, and he took me a mile in a single buggy, and we had to stop and change with a farmer, and I was taken into the hospital and have remained here ever since. I couldn't say what kind of a gun McLain Cooper used; it looked like a Smith & Wesson; it was a nickel plated gun. I would say it was a 32 or 38; they look larger than they really are. After the shooting McLain Cooper took the team and went to the Sutton farm; I think George was down there. I have seen McLain since the shooting. It was when they changed me to a double rig and he was with the sheriff, with Osmon, and the deputy got out and come over to help change me. I made no threats against McLain Cooper when I went to the house from the barn that morning; there wasn't a word spoken. I didn't intend to get any weapon; I intended to get my coat and get out of there and leave, and that is all I intended to do. I never had any trouble in particular with any of the men. We used to have little chewing matches with some of them, but you know how it is with a big crew of men. I sent a few of them down the line for the money. That is as much trouble as I ever had there, which Mr. Cooper always upheld; that is, Harry J. Cooper. I never had any trouble with McLain Cooper about the men. I heard the gun report when I dropped, at least that is what I thought I heard, you know. McLain Cooper was right behind

me and then he walked right around me.    I went with my head that way and he walked right around me, and he says, 'I got plenty more.' He had the gun in his hand and he is the one that shot me.

"The foregoing statement, consisting of seven typewritten pages and six lines on the eighth page, is my dying declaration, in my own words, and is a true and correct statement of the facts concerning the matter referred to therein.    The same has just been read to me, and I now solemnly say and declare that the same is true and correct, believing that I am dying.    My doctor and the nurses have just told me that I must now die, and I fully realize that death is near when I make this solemn declaration of facts, and I now sign my name hereto in the presence of these witnesses who have also subscribed their names hereto as witnesses this 29th day of June, A. D. 1911."

The testimony of Dr. Anderson, B. C. Boyd, and William C. Green shows conclusively that the dying declaration of James Franklin Ross was made under the conviction on his part that his death was unavoidable and near at hand.    Special emphasis may be drawn to that portion of the declaration which deals with his firm conviction that his death was inevitable and near at hand, and every inference seemed to be at hand to induce the telling of the truth.    The words specially emphasized are as follows: "The foregoing statement, consisting of seven typewritten pages and six lines on the eighth page, is my dying declaration, in my own words, and is a true and correct statement of the facts concerning the matter referred to therein.    The same has just been read to me, and I now solemnly say and declare that the same is true and correct, believing that I am dying.    My doctor and the nurses have just told me that I must now die, and I fully realize that death is near when I make this solemn declaration of facts, and I now sign my name hereto in the presence of these witnesses, who have also subscribed their names hereto as witnesses this 29th day of June, A. D. 1911."

We are firmly convinced that such testimony is of the highest character.    The solemnity of the occasion, the fact that all earthly hopes and desires were about to disappear, no reason for deception, every reason for telling the truth, the end of all time for the declarant ebbing away, all eternity steadily and rapidly approaching, are significant reasons for giving credit to such testimony.    What more binding force

could an oath duly administered by a proper officer have? An oath is simply a declaration that one will tell the truth, the whole truth, and nothing but the truth, concerning a certain subject-matter about to be inquired into. That which gives the solemnity to an oath are the concluding words, "So help me God." That means that God is called as a witness to the oath, and the responsibility of the one taking the oath is that he is made to realize that, if he testifies falsely, God as his witness does know it, and that he will be confronted by his lying statements at the eternal bar of justice. Comparing the surrounding conditions of a person about to die and his dying declaration, the binding force of such reasoning is equally present with him without the administration or necessity of an oath. The dying person knows and realizes and has been told that death is near; he feels its approach he is almost gathered into the arms of death; he realizes that he must soon appear before that same bar of justice to be adjudged as to every act of life, and it is almost beyond comprehension that he should approach the great bar of justice with a lie trickling from his lips.

To this point the discussion has largely been confined to the admission of dying declarations in criminal cases. It is said that dying declarations are in the nature of hearsay evidence, and for that reason are not admissible, but in criminal cases an important exception has been made on the ground of public policy. If the rule, however, be founded in reason and justice, it should be applicable in any case where a valuable right is involved, whether that right be a personal right or a property right. If, as in the trial of a case of homicide, where the person accused of a crime has at stake at such trial possibly his life, or where he may lose his liberty by being confined in the penitentiary for the term of his natural life, the dying declarations of his victim are admissible as evidence against the accused's right to life or liberty as the case may be. It would seem by analogy that dying declarations would be admissible in support of a right less valuable than life or liberty, that is, a property right; and where such dying declaration is admitted for the purpose of proving the homicide, connecting the accused with its commission, it would seem it should be admissible to prove a property right which may have had its origin out of the homicide and facts connected therewith. Wigmore on Evidence, § 1436, says: "We are confronted with a restrictive rule of evidence commend-

able only for its age, its respectability resting solely upon a habit of judicial recognition, formed without reason, and continued without justification. The fact that the reason for a given rule perished long ago is no just excuse for refusing now to declare the rule itself abrogated, but rather the greater justification for so declaring; and, if no reason ever existed, that fact furnishes additional justification." In Thurston v. Fritz, 91 Kan. 468, 50 L.R.A.(N.S.) 1167, 138 Pac. 625, the court said: "The history of the rule, and its application as given by the leading text-writers on evidence, shows that at a very early time it was thought with the fathers of the civil law that one would tell the truth on his deathbed, and for a time dying declarations were admitted in cases both civil and criminal; but later they were confined to cases of homicide, the idea having become prevalent that so exceptional and dangerous a class of evidence should be restricted in its use and application to the 'public necessity of preserving the lives of the community by bringing manslayers to justice.' . . . Some have sought to base the change which restricts such evidence to the one class of cases on the fact disclosed by experience, that some really do not tell the truth even *in articulo mortis,* and hence it is argued that it was deemed safer to exclude such statements except when the exclusion might let a murderer go free. If this was ever seriously deemed the basis of the change, it certainly lacked the merit of logic or consistency, for some are not truthful when under the sanction of an oath duly administered, and in no class of cases should doubtful evidence be received more charily than in those involving the life and liberty of the one on trial. And by so much the more should any sort of evidence safe to be admitted in such a case be deemed proper in an action involving mere property rights. Professor Wigmore suggests that 'the notion that crime is more worthy the attention of courts than a civil wrong is a traditional relic of the days when civil justice was administered in the royal courts as a purchased favor, and criminal prosecutions in the King's name were zealously encouraged because of the fines which they added to the royal revenues. The sanction of a dying declaration is equally efficacious whether it speaks of a murder or a robbery or a fraudulent will; and the necessity being the same, the admissibility should be the same.' "

The learned trial court, after a careful consideration of the law, held that the dying declaration in this case was admissible, and the same was

admitted as evidence in the case and as part of the *res gestæ.* The dying declaration was in writing and relates only to facts to which he would have been competent to testify if sworn as a witness. Oliver v. State, 17 Ala. 587; Whitley v. State, 38 Ga. 50; Brock v. Com. 92 Ky. 183, 17 S. W. 337; People v. Knapp, 26 Mich. 112; State v. Reed, 137 Mo. 125, 38 S. W. 574; State v. Carrington, 15 Utah, 480, 50 Pac. 526.

Dying declarations may be made to anyone competent as a witness to testify to the transaction of the person accused. They may be made to the prosecuting attorney, and, if so, he is a competent witness, or it may be made to various persons, and not necessarily to just one. 4 Enc. Ev. 982.

Dying declarations are not inadmissible in evidence because they are made in answer to questions which were propounded to the declarant. 4 Enc. Ev. 983. Declarations may be reduced to writing by the declarant or someone for him, and such declarations are admissible in evidence. 4 Enc. Ev. 984. It has also been held that reading is not a necessary prerequisite to its admissibility in evidence. It is sufficient if the declarant retains his reasoning faculties and affirms the correctness of the statements made after he has given up all hope of recovery. Reg. v. Steele, 12 Cox, C. C. 168; People v. Gray, 61 Cal. 164, 44 Am. Rep. 549; People v. Hodgdon, 55 Cal. 72, 36 Am. Rep. 30; Mockabee v. Com. 78 Ky. 380; Young v. Com. 6 Bush, 312; State v. McEvoy, 9 S. C. 208; Snell v. State, 29 Tex. App. 236, 25 Am. St. Rep. 723, 15 S. W. 722.

The former opinion of this court handed down at the December, 1916, term, the writer of this opinion believes is not based upon sound principles of law applicable to this case, and, in addition to that, is based upon a misconception of the true relations existing between all the parties, and before a true conception of the legal principles which apply to this case can be had, the definite relationship, duty, or authority of James Franklin Ross, McLain Cooper, and Harry J. Cooper, must be ascertained. It is undisputed that James Franklin Ross was in the employ of Harry J. Cooper as a servant, and as the testimony shows, to some extent at least, as the foreman for a large farm of Harry Cooper. The testimony also shows that McLain Cooper was engaged in rendering service to Harry J. Cooper upon said farm; that

his employment commenced on or about the 13th day of December, 1910. Prior to this time James Franklin Ross had been the foreman, and as such had the direction of the affairs of such farm under his control, subject only to the directions of the master, Harry J. Cooper. That on the 13th day of December, 1910, a very important matter which bears upon the issues of this case took place, which was the delegation of all the powers heretofore possessed by Harry J. Cooper as master to his son, McLain Cooper, so that as between James Franklin Ross and McLain Cooper, whatever orders, directions, control, or authority McLain Cooper exercised over or concerning James Franklin Ross, while upon such farm, were given or exercised by reason of the authority of the master delegated to him. He was exercising the master's authority for the master. Harry J. Cooper had gone South for the winter. The allegations of the complaint in paragraph 6 thereof allege the delegation of authority from Harry J. Cooper as master, to McLain Cooper, in the following words: "That on the 13th day of December, A. D. 1910, the defendant Harry J. Cooper employed his said son, the said McLain S. Cooper, to manage and control the operation of the so-called 'West Cooper farm,' described in the first paragraph of this complaint, and hired and engaged him to take charge of, care for, guard, protect, handle, and operate the same and all the personal property thereon, thereunto belonging and used in connection therewith; and at said time, for such purpose, did install him, the said McLain S. Cooper, in full and complete possession, and place him in supreme and active control, charge, and custody thereof, with full and complete authority, power, and jurisdiction to hire, employ, and discharge such assistants, servants, agents, and employees as he, the said McLain S. Cooper, might deem necessary or convenient; and did in all things grant and intrust unto the said McLain S. Cooper as full and complete power and authority as he, the said Harry J. Cooper, had in and about the premises."

The answer of the defendant in paragraph 1 admits all of the allegations contained in paragraph 6, so that for the purpose of managing, directing, and controlling all the matters of business of such farm and the conduct thereof, the powers and authority of the master Harry J. Cooper were for the time in question at least delegated to McLain Cooper, and in the exercise of such delegated powers and authority in

a proper manner with due respect and consideration for the rights of third parties, Harry J. Cooper would be responsible in damages if McLain Cooper wrongfully exercised such delegated powers so as to injure third persons, and Harry J. Cooper's liability for any damages thus arising would not be determined by assuming the position of Mc-Lain Cooper to be that of a servant who turned aside from the exercise of his regular duties and did some wrongful and injurious act to a third person, but this liability must be determined by the position of McLain Cooper as acting under the delegated powers of the master.

Jaggard on Torts, page 1043, says: "Positively one employee becomes vice principal of another only when he is intrusted with the performance of some absolute and personal duty of the master himself. These duties are not only absolute, but they are also inalienable and nonassignable. They may be devolved on others by the master, but not without recourse to him. For negligence in the discharge of these duties he is liable. It is immaterial whether such negligence is his own or that of his servant. In this sense the servant is *alter ego* of the master, or vice principal." James Franklin Ross was a servant of Harry J. Cooper. If Harry J. Cooper was going to employ another servant to whom he would delegate his authority as master, who should govern, control, and direct the acts, and work of the servant James Franklin Ross, it was the bounden and absolute duty of Harry J. Cooper, in selecting such servant to whom he delegated his powers as master, to know and to use that degree of care which an employer should take in employing and providing such servant to whose orders James Franklin Ross would be subject, and who would have the control and direction of the work James Franklin Ross was doing. The employer, the master, is not justified in subjecting his servant, James Franklin Ross, to injury from an incompetent, negligent, or otherwise unfit servant. He is liable if he knew, or, in the exercise of reasonable diligence, could have known, of the unfitness, incompetency, or insufficiency from any reason, of the servant he employed to exercise the authority of master over other servants of the master. McLain Cooper was a very young boy to intrust with the management, control, and direction of men a great deal older than himself, and was very young to assume the heavy responsibility delegated to him to perform by Harry J. Cooper. McLain Cooper was the son of Harry J. Cooper. Whatever weak-

nesses of character, of temper, disposition, or habits that McLain Cooper had were known to the father, or in the exercise of ordinary care and observation could have been known to the father. McLain Cooper must have been possessed of an ungovernable, uncontrollable temper, when, as the record shows, without any provocation, or after firing three shots at James Franklin Ross in the barn, within a few minutes afterwards, while James Franklin Ross was on his way to the house where his family lived, no doubt for the purpose of preparing to leave the premises as per the orders of McLain Cooper, he followed James Franklin Ross, and while James Franklin Ross had his back towards McLain Cooper, McLain Cooper deliberately shot James Franklin Ross in the back, from which wound he shortly afterwards died. We repeat, the record contains no provocation for such an act, and when such act was done under the circumstances and conditions under which it was done in this case, we cannot help but reach the conclusion that McLain Cooper had an ungovernable and vicious temper, which must have been known, or should have been known at least, to Harry J. Cooper; and if Harry J. Cooper knew, or should have known in the exercise of ordinary intelligence and observation, and by reason of the close association and relation of father and son, of the character, temper, and habits of McLain Cooper, he then also knew or should have known that McLain Cooper was not a fit and proper person to whom to delegate his powers and authority as master, to have control, authority, and direction over other servants employed upon the large farm hereinbefore described, upon which James Franklin Ross was employer. Harry J. Cooper, therefore, as a matter of law, would be liable for any damages or injury which was occasioned to third parties by the improper use of the powers and authority delegated to McLain Cooper by Harry J. Cooper, and which were exercised in a wrongful, improper, and injurious manner by McLain Cooper. Harry J. Cooper is liable, therefore, for the negligence of McLain Cooper while exercising the powers delegated to him to which we have heretofore referred.

The plaintiff in this case, in the court below, recovered a judgment for $3,500. She is the wife of James Franklin Ross. They had two children,—one of their own and one adopted. It was the duty under the law for James Franklin Ross to support his wife, this plaintiff, and the two children. McLain Cooper, while exercising the powers and

authority heretofore referred to, delegated to him by Harry J. Cooper, as we have heretofore described, shot and killed James Franklin Ross and thereby took away the only means of support that plaintiff and her children in this case had; and considering all the facts and circumstances in this case, the damages are very small, as compared by the great loss sustained by this plaintiff, and we think from all that has been said, and from the analysis of the law of the case, that the judgment of the district court is a just one, and should be affirmed.


## On Second Petition for Rehearing.

ROBINSON, J.    See also — N. D. —.    This case has been well and thoroughly argued by counsel and by the judges in conference.    By a majority of the judges a decision was given in favor of the defendant, and a motion for rehearing was denied.    Now a second petition for rehearing is filed on the same grounds as presented in the former petition, and on an affidavit in regard to the supposed disqualification of Justice Birdzell to sit as a judge in the case.

The affidavit shows that long prior to the time of the presentation of this case on rehearing, and under the supposition that the case would be disposed of before Justice Birdzell would become a member of the court, on a train Chas. A. Lyche, attorney for defendant, had some conversation with Justice Birdzell, in which he intimated that he had a decided view on the law of the case, and expressed some doubts concerning his qualification to sit as a judge.    Prior to the argument that question was submitted to the attorneys, and it was agreed that there was no objection to Judge Birdzell.    There is no claim that he was related to either party, that he had ever been consulted or retained as counsel, or that he had any personal interest in the case.    The fact that he may have had a decided opinion concerning the law was no disqualification.    Doubtless Justice Robinson had a more decided opinion concerning the law and the facts of the case, and it was shown by his strenuous dissent.

The case involved mixed questions of law and fact on which judges might well differ.    It is proper and right that every judge should know the law and have a decided opinion concerning the law of every case,

and there would be no propriety in now reopening and referring this case for decision to some judge of the district court. There must be an end to litigation. The motion is denied.